1   REED R. KATHREIN (139304)
    PETER E. BORKON (212596)
2   HAGENS BERMAN SOBOL SHAPIRO LLP
    715 Hearst Avenue, Suite 202
3   Berkeley, CA 94710
    Telephone: (510) 725-3000
4   Facsimile: (510) 725-3001
    reed@hbsslaw.com
5   peterb@hbsslaw.com

6   LEWIS S. KAHN
    KAHN GAUTHIER SWICK, LLC
7   650 Poydras Street, Suite 2150
    New Orleans, LA 70130
8   Telephone: (504) 455-1400
    Facsimile: (504) 455-1498
9   lewis.kahn@kgscounsel.com

10  Attorneys for Plaintiff

11  [Additional counsel listed on signature page]

12                                                              CRB

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15  WILLIAM WATKINS, Individually and        )  Case No.    0271
    on Behalf of All Others Similarly Situated, )
16                                            )
                          Plaintiff,          )  CLASS ACTION COMPLAINT FOR
17                                            )  VIOLATIONS OF FEDERAL
         v.                                   )  SECURITIES LAWS
18                                            )
    SHORETEL, INC., JOHN W. COMBS,            )
19  MICHAEL E. HEALY, EDWIN J. BASART,        )
    GARY J. DAICHENDT, THOMAS VAN             )
20  OVERBEEK, KENNETH D. DENMAN,              )
    CHARLES D. KISSNER, EDWARD F.             )
21  THOMPSON, LEHMAN BROTHERS, INC.,          )  **JURY TRIAL DEMANDED**
    J.P. MORGAN SECURITIES, INC. and          )
22  PIPER JAFFRAY & CO.,                      )
                                              )
23                        Defendants.         )
                                              )
24  ─────────────────────────────────────────

25

26

27

28

000700-00 217946 V1

## I.    NATURE OF THE ACTION

1.    This is a class action brought on behalf of the purchasers of ShoreTel, Inc. ("ShoreTel" or the "Company") common stock pursuant to the July 3, 2007 Initial Public Offering ("IPO" or the "Offering") of 9.085 million shares of common stock.  In connection with this Offering – of which 7.9 million shares were sold in the IPO and 1.185 million shares were sold pursuant to an oversubscription option granted to the IPO underwriters – Defendants raised gross proceeds of at least $86.3075 million.

2.    ShoreTel, its entire Board of Directors, its Chief Financial Officer and the Underwriters involved in the Offering (including, Lehman Brothers, Inc., J.P. Morgan Securities, Inc. and Piper Jaffray & Co.), are each charged with including or allowing the inclusion of materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the IPO, in direct violation of the Securities Act of 1933.  Furthermore, Defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and they also each failed to reveal, at that time of the IPO, that the Company was not operating according to plan and that ShoreTel's sales already had been, and foreseeably would continue to be, adversely affected as a result of a slow-down in demand for ShoreTel products and services.

3.    It was not until January 7, 2008, however, that investors learned the truth about the Company – including that the problems which existed at the time of the IPO would result in extremely disappointing results for the third quarter of fiscal 2008 (the period ended December 31, 2007), including much lower than expected revenues and higher than expected costs and expenses. In addition, by this time, it became obvious to investors that the Company did not maintain adequate internal controls, and that a proper due diligence investigation into the Company, by the Underwriters, was not properly carried out prior to the Offering.

4.    Following the publication of these disappointing results the price of ShoreTel stock collapsed.  As evidence of this, shares of ShoreTel fell over 50% in a single trading day – plummeting from a close of over $13.00 per share the prior trading day, to a close of $6.02 per share on January 7, 2008.   ShoreTel also experienced exceptionally heavy trading volume with over 6 million shares traded – over thirty times the Company's recent average daily trading volume.

## II.    JURISDICTION AND VENUE

5.    The claims asserted herein arise under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act").

6.    Jurisdiction is conferred by § 22 of the Securities Act.

7.    Venue is proper pursuant to § 22 of the Securities Act, as Defendant ShoreTel and/or the Individual Defendants and Underwriter Defendants – Lehman Brothers, Inc., J.P. Morgan Securities, Inc. and Piper Jaffray & Co. – are located in this District, maintain offices in this District and conduct business in this District.

8.    In addition to the foregoing, the wrongful conduct complained of herein substantially took place in this District.

9.    Intradistrict Assignment: Assignment to the San Jose division of this Court is appropriate because Defendants' headquarters and principal place of business is in Sunnyvale, California.  Because the action arises in the County of Santa Clara, pursuant to Northern District of California Local Rule 3-2(d), assignment to the San Jose Division is proper.

## III.    THE PARTIES

### A.    Plaintiff

10.    Plaintiff **WILLIAM WATKINS** purchased shares of ShoreTel common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by defendants in connection with the July 2007 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

### B.    Corporate Defendants

11.    Defendant **SHORETEL** is a Delaware corporation founded in 1996 and headquartered in Sunnyvale, California.  ShoreTel and its subsidiaries provide switch-based Internet protocol (IP) telecommunications systems primarily for domestic enterprises.  The Company's systems are based on its distributed software architecture and switch-based hardware platform that enable a single telecommunications system to serve multi-site enterprises.  ShoreTel sells its systems through a network of 470 channel partners.

12.     The individuals identified as Defendants in subparagraphs (a) - (d) below, are referred to collectively herein as the "Individual Defendants."   The Individual Defendants are each liable for the false statements contained in the materially false and misleading Registration Statement and joint Prospectus, as alleged herein, as those statements were "group-published" information.   The Individual Defendants include the following:

a)     Defendant **JOHN W. COMBS** ("Combs") is, and at the time of the July 2007 IPO was, Chairman of the Board of Directors, Chief Executive Officer, President and Co-Founder of ShoreTel.  Defendant Combs signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the IPO.

b)     Defendant **MICHAEL E. HEALY** ("Healy") is, and at the time of the July 2007 IPO was, Chief Financial Officer and Principal Accounting Officer of the Company. Defendant Healy substantially assisted in the preparation of the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the IPO.

c)     Defendant **EDWIN J. BASART** ("Basart") is, and at the time of the July 2007 IPO was, a Founder of the Company, its Chief Technology Officer and a member of the Board of Directors of ShoreTel.  Defendant Basart signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Pospectus issued in connection with the IPO.

d)     The defendants identified below are, and at the time of the July 2007 IPO were, members of the Board of Directors of the Company, and signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the IPO, as follows: **GARY J. DAICHENDT** ("Daichendt"), **KENNETH D. DENMAN** ("Denman"), **CHARLES D. KISSNER** ("Kissner"), **THOMAS VAN OVERBEEK** ("Overbeek"), and **EDWARD F. THOMPSON** ("Thompson").

**C.     IPO Underwriter Defendants**

13.     In connection with the July 2007 ShoreTel Initial Public Offering, defendants **LEHMAN BROTHERS, INC.** ("Lehman Bros."), **J.P. MORGAN SECURITIES, INC.** ("J.P.

Morgan") and **PIPER JAFFRAY & CO.** ("Piper Jaffray"), are each investment banks that acted as Underwriters and/or Lead Underwriters of the Offering – distributing 7.9 million shares of ShoreTel stock to investors and initiating the first public market for ShoreTel shares (not including 1.805 million shares sold pursuant to an oversubscription option), as follows:

| Underwriters | Number of Shares |
|---|---|
| Defendant Underwriter Lehman Brothers Inc. | 2,765,000 |
| Defendant Underwriter J.P. Morgan Securities Inc. | 2,765,000 |
| Defendant Underwriter Piper Jaffray & Co. | 1,185,000 |
| Non-Defendant Underwriter: JMP Securities LLC | 592,500 |
| Non-Defendant Underwriter: Wedbush Morgan Securities Inc. | 592,500 |
| **Total** | 7,900,000 |

14.    In connection with the July 2007 IPO, the Underwriter Defendants were paid over $6.04 million in gross fees – paid indirectly by purchasers of the Company's shares. The Underwriter Defendants were paid at least $0.665 per share in connection with the sale of the 9.085 million shares, including shares sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| | No Exercise | Full Exercise |
|---|---|---|
| Per share | $0.665 | $0.665 |
| Total | $5,253,500 | $6,041,525 |

15.    Shareholders were willing to, and did, pay over $6.041 million in combined fees to compensate the Underwriter Defendants for conducting a purported significant "due diligence" investigation into ShoreTel in connection with the IPO. The Underwriter Defendants' due diligence investigation was a critical component of the Initial Public Offering, and was supposed to provide investors with important safeguards and protections.

16.    The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into ShoreTel sales, accounting, controls, procedures and also required defendants to test the assumptions and verify the projections adopted or ratified by defendants, to the extent a reasonable investor with access to such confidential corporate information

1    would. A reasonable due diligence investigation would have extended well beyond a mere casual

2    review of ShoreTel books and records, and its accounting, financial reports and operational and

3    financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence

4    investigation was a substantial contributing factor leading to the harm complained of herein.

5        17.    In addition to the foregoing, because of the Underwriter Defendants' and Individual

6    Defendants' positions with the Company, they each had access to the adverse undisclosed

7    information about ShoreTel's business, operations, products, operational trends, financial statements,

8    markets and present and future business prospects via access to internal corporate documents

9    (including the Company's operating plans, budgets and forecasts and reports of actual operations

10   compared thereto), conversations and connections with other corporate officers and employees,

11   attendance at management and Board of Directors meetings and committees thereof and via reports

12   and other information provided to them in connection therewith.

13       18.    In addition to the Underwriting Defendants, it is also appropriate to treat the

14   Individual Defendants as a group for pleading purposes and to presume that the false, misleading and

15   incomplete information conveyed in the Company's public filings, press releases and other

16   publications as alleged herein are the collective actions of the narrowly defined group of defendants

17   identified above. Each of the Individual Defendants, by virtue of their high-level positions with the

18   Company, directly participated in the management of the Company, was directly involved in the

19   day-to-day operations of the Company at the highest levels and was privy to confidential proprietary

20   information concerning the Company and its business, operations, products, growth, financial

21   statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were

22   also involved in drafting, producing, reviewing and/or disseminating the false and misleading

23   statements and information alleged herein, and approved or ratified these statements, in violation of

24   the federal securities laws.

25       19.    As officers and controlling persons of a publicly-held company whose common stock

26   was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq

27   stock market exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws,

28   the Individual Defendants each had a duty to disseminate promptly, accurate and truthful

information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock in July 2007, violated these specific requirements and obligations.

20.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the Offering. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## IV.     MATERIALLY FALSE & MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT AND PROSPECTUS

21.     On July 3, 2007, ShoreTel published a release announcing that defendants had priced the Initial Public Offering of its shares at $9.50 per share. This release stated, in part, the following:

> SUNNYVALE, CA, July 3, 2007 - ShoreTel, Inc., a leading provider of enterprise IP telephony solutions, today announced the pricing of its initial public offering of 7,900,000 shares of its common stock at a price to the public of $9.50 per share. In addition, ShoreTel® has granted the underwriters a 30-day option to purchase up to an additional 1,185,000 shares of common stock. ShoreTel's common stock will trade on the Nasdaq Global Market under the ticker "SHOR".

> Lehman Brothers Inc. and J.P. Morgan Securities Inc. are acting as joint book-running managers for the offering, and Piper Jaffray & Co., JMP Securities LLC, and Wedbush Morgan Securities Inc. are acting as co-managers.
> The offering is being made only by means of a prospectus, a copy of which may be obtained from the prospectus department of Lehman Brothers Inc., c/o Broadridge, 1155 Long Island Avenue, Edgewood, NY 11717 (fax: 1-631-254-7140, or e-mail at qiana.smith@broadridge.com) or from J.P. Morgan Securities Inc., 4 Chase Metrotech Center, CS Level; Brooklyn, New York 11245 (telephone: 1-866-430-0686).

22.     The same day, on Form 424B4, defendants also filed with the SEC a Registration Statement in connection with the ShoreTel IPO.  The IPO Registration Statement and Prospectus portrayed ShoreTel as a company that had experienced – and was continuing to experience – significant growth in revenues, earning, gross margins and other positive key financial and operational metrics.  As evidence of this, the Registration Statement stated, in part, the following:

> *We have experienced significant growth in recent periods, with our total revenue growing from $18.8 million for 2004 to $61.6 million for 2006. This growth in revenue has largely been driven by increased demand for IP telecommunications systems from new enterprise customers, as well as sales of additional products to our installed enterprise customer base*. Our operating expenses have also increased significantly from $15.7 million for 2004 to $30.4 million for 2006. This growth in operating expenses has primarily been driven by our growth in headcount, from 76 employees at June 30, 2004 to 174 employees at June 30, 2006, and to 250 employees at March 31, 2007. *We expect to continue to add personnel in all functional areas, including additional sales and support personnel...* [Emphasis added.]

23.     The statements concerning the Company's recent growth trends were further confirmed by the selected financial statements that defendants included in ShoreTel's Registration Statement that focused on purported substantial recent gains in Net Income, Revenue, Net Cash and Gross Profit, in addition to other key financial metrics, in part, as follows:

| CONSOLIDATED STATEMENTS OF CASH FLOWS | Year Ended June 30, | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|
| (Dollars in thousands) | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | |
| Net income (loss) | $(6,251) | $(1,402) | $4,002 | $  2,332 | $  4,188 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in)  operating activities: | | | | | |
| Accounts payable | 1,199 | 1,020 | 809 | (1,066) | 3,780 |
| Deferred revenue | 1,167 | 2,841 | 1,505 | 937 | 5,398 |
| [Data Omitted] | *** | *** | *** | *** | *** |
| Net cash provided by (used in) operating activities | (5,392) | (4,957) | 7,266 | 4,525 | 5,039 |

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended June 30, | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | |
| | (Dollars in thousands, except per share amounts) | | | | |
| REVENUE: | | | | | |
| Product | $ 16,587 | $ 31,970 | $ 55,300 | $ 37,972 | $ 61,473 |
| Support and services | 2,241 | 3,512 | 6,308 | 4,552 | 7,431 |
| Total revenue | 18,828 | 35,482 | 61,608 | 42,524 | 68,904 |
| COST OF REVENUE: | | | | | |
| Product | 7,725 | 13,961 | 21,855 | 15,723 | 21,271 |
| Support and services | 1,660 | 2,907 | 5,425 | 3,942 | 4,853 |
| Total cost of revenue | 9,385 | 16,868 | 27,280 | 19,665 | 26,124 |
| GROSS PROFIT | 9,443 | 18,614 | 34,328 | 22,859 | 42,780 |

24.     In addition to the foregoing, the IPO Registration Statement and Prospectus also reported that defendants continually tested and monitored these key financial metrics, and that all known or foreseeable trends regarding the Company's business was disclosed at the time of the July 2007 IPO.  As evidence of this, the ShoreTel IPO Prospectus also stated, in part, the following:

**Key Business Metrics**

***We monitor a number of key metrics to help forecast growth, establish budgets, measure the effectiveness of sales and marketing efforts and measure operational effectiveness.***

**Initial and repeat sales orders....**

**Deferred revenue....**

**Gross margin....**

**Operating expense management....**

[Emphasis added.]

25.     The representations concerning the Company's ability to monitor, adjust and report key financial metrics at the time of the July 2007 IPO was especially important to ShoreTel investors because, at the time of the Offering, ShoreTel had reported that certain internal control deficiencies had been detected.  As evidence of this, the IPO Registration Statement stated, in part, the following:

**Internal Control Over Financial Reporting**

In connection with the audit of our financial statements for the six-month period ended December 31, 2006, our independent registered public accounting firm noted

in their report to our audit committee that we have material weaknesses and significant deficiencies in our internal control over financial reporting as of December 31, 2006 that could, if not remedied, affect our ability to record, process and report financial data. In their report, our independent registered public accounting firm has noted two specific material weaknesses:

- we do not have a sufficient number of accounting personnel with the relevant technical accounting and financial reporting experience and skills to facilitate the preparation of timely and accurate consolidated financial statements; and

- we do not have sufficient internal controls related to the identification of all products and services associated with a sales arrangement, including commitments made by our sales and marketing personnel and channel partners to provide specified upgrades, services or additional products to customers in the future, including through product roadmap presentations to customers.

If VSOE of fair value does not exist for commitments to provide specified upgrades, services or additional products to customers in the future, as has been the case from time to time in the past, we defer all revenue from the arrangement until the earlier of the point at which VSOE of fair value does exist or all such elements from the arrangement have been delivered.

In addition to the material weaknesses noted by our independent registered public accounting firm, the following two significant deficiencies in the design or operation of our internal control over financial reporting were also noted:

- we do not accurately maintain data sufficient to readily track and validate the existence of fixed assets and we have no formal procedures in place to ensure that fixed assets continue to be held and used;
- we do not have adequate procedures for identifying and recording period-end accrued expenses and in-transit inventory.

These material weaknesses and significant deficiencies resulted in a number of audit adjustments to our consolidated financial statements for the six-month period ended December 31, 2006 that were noted during the course of the audit. In addition, these material weaknesses and significant deficiencies contributed to delays in the completion of our financial statements.

26.    In addition to the foregoing, the IPO Registration Statement also stated that defendants had already taken material steps reasonably believed to be sufficient to cure such control and procedure deficiencies, in part, as follows:

We are in the process of taking steps intended to remedy these material weaknesses and significant deficiencies. Since both material weaknesses relate at least in part to inadequate staffing, we are addressing them through the hiring of additional personnel. We hired a new Chief Financial Officer in May 2007, and we are currently seeking to hire a Corporate Controller, a Revenue Accounting Manager and other finance and accounting personnel. Further, we expect that our former Chief Financial Officer, John Finegan, will be actively employed as our Vice President of Finance for an indefinite period as new staff members are hired and integrated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS                                    - 9 -

To further address the material weakness related to the proper accounting for sales arrangements containing future commitments, we are implementing additional procedures and training programs for all personnel involved in the selling and marketing of our products and services and in the preparation of our financial statements. We have also analyzed product roadmaps used for sales presentations to determine when or if a specified upgrade right has been provided to a customer notwithstanding that a contract does not explicitly provide for that right. For sales prior to March 31, 2007, we identified a few instances in which we created specified upgrade or enhancement rights as a result of these roadmap presentations. However, these were not significant to our results of operations or financial statements. We are continuing to analyze our product roadmap presentations used in connection with sales made subsequent to March 31, 2007. If it is subsequently determined that these presentations resulted in commitments for specified upgrades or enhancements, we would be required to defer the recognition of revenue attributable to such sales until such commitments had been satisfied.

27.     The statements made by defendants and contained in the Company's Registration Statement and Prospectus, were materially false and misleading at the time of the July 2007 IPO for, among other reasons, the following:

a)     At the time of the IPO, the Company was already evidencing a deterioration across its product line, such that ShoreTel was no longer operating according to plan and such that it was foreseeable that the Company would not be able to achieve earnings, revenue, profits or gross margin projections made by defendants at the time of the Offering;

b)     At the time of the IPO, in an effort to mask reduction in demand and declines in sales, defendants prematurely recognized revenues by pulling sales forward into earlier periods and by stuffing its distribution channel with excess products and inventory – more than could foreseeably be used in the near term – and had taken other measures designed to further prematurely recognizing revenues by draining sales from consecutive periods;

c)     At the time of the IPO, in addition to the reported control deficiencies that existed within the Company, it is now obvious that ShoreTel did not maintain even the minimum standards of good Corporate Governance or controls and procedures that were reasonably necessary to conduct operations, as is required by the SEC and the Company's own internal guidelines and standards of business conduct;

d)     As a result of the foregoing undisclosed problems that existed at the time of the July 2007 ShoreTel IPO, and thereafter throughout the relevant period, guidance sponsored

1    and/or endorsed by defendants was not reasonable or based on the true facts that existed at that time;

2    and

3            e)        At the time of the July 2007 IPO, defendants had not conducted an adequate

4    due diligence investigation into ShoreTel, that would have revealed many of the issues, and that

5    would most likely have prevented the sale of this Company to shareholders through the public equity

6    markets at that time, or at the inflated price at which these shares were originally sold.

7            28.    In addition to the materially false and misleading statements contained in the

8    Registration Statement and joint Prospectus, in recognition of the purported success of the ShoreTel

9    IPO, on July 17, 2007, the Company filed with the SEC pursuant to Form 8-K, a notice of increased

10    bonuses and compensation of certain officers that stated, in part, the following:

11        Item 5.02. Re: Compensatory Arrangements of Certain Officers.

12        **Approval of Executive Bonus Plan for First Half of Fiscal Year 2008.**

13        On July 11, 2007, the Compensation Committee (the "Committee") of the Board of
         Directors of ShoreTel, Inc. (the "Company") approved the ***Executive Bonus Plan***
14        for the first six months of fiscal year 2008 (the "Plan"). Individuals who are deemed
         to be "officers" of the Company for purposes of Section 16 of the Securities
15        Exchange Act of 1934, as amended ("Executive Officers"), including each of the
         Company's named executive officers, are ***eligible to receive cash awards following***
16        ***December 31, 2007, based upon the attainment of performance objectives***
         ***established by the Committee for the six-month period,*** the size of the bonus pool
17        and each participant's performance rating. The performance objectives under the
         Plan consist of pre-defined ranges of: (i) revenue; (ii) non-GAAP operating profit;
18        and (iii) customer satisfaction, based on scores from the Company's satisfaction
         surveys. The bonus pool is equal to the product of (a) a percentage determined
19        under the Plan, based on the extent to which all three performance objectives are
         achieved within the pre-defined ranges established by the Committee, multiplied by
20        (b) a dollar amount equal to 45% times the sum of each participant's base salary six-
         month period, except for the CEO, a dollar amount equal to 85% of the CEO's base
21        salary for the six-month period. Each participant's performance rating depends on
         the participant's achievement of pre-defined individual performance goals and
22        objectives established for the participant by the Committee, and may be adjusted by
         the Committee to reflect his or her achievement relative to the achievement of other
23        participants.

24        Under the Plan, the bonus target for the Company's Chief Executive Officer is
         currently 85% of his base salary, and the target bonus is 45% of base salary for
25        other Executive Officers. The maximum cash award any participant may receive
         under the Plan is 225% of that participant's target bonus, although total payments
26        under the Plan cannot exceed the bonus pool.
                                                            [Emphasis added.]

27

28

29.    As further evidence of the purported success of the Company's July 2007 IPO, on August 14, 2007, when defendants reported results for the fourth quarter and fiscal year end 2007, the period ended June 30, 2007, the Company published a release that also stated, in part, the following:

> *"We are pleased with our fourth quarter and fiscal year financial results,"* *commented John W. Combs, chairman, president and CEO of ShoreTel.* "We achieved close to $100 million in revenue in fiscal 2007 which represents a major milestone in our business. Our growth resulted from increasing market acceptance of the ShoreTel IP telephony system, the productivity of our high-quality channel partners, and our leadership position in overall customer satisfaction. *We believe our advanced distributed architecture provides customers with a communications systems that is the easiest to install, manage and use, while also providing the industry's highest reliability and a low overall total cost of ownership.*
>
> *"The completion of our IPO is expected to build additional brand awareness that will enable us to compete in more sales opportunities. We plan to broaden our channel programs to reach larger customers both domestically and internationally.* Our unique architecture is a major competitive differentiator and a key factor in driving our compelling win rate.
>
> *"We believe that our progress to date is a positive indicator of the opportunity ahead. We are optimistic about our outlook for 2008 and are planning for revenue growth of 40-45% over the prior year.* ShoreTel is well-positioned to rapidly grow our top line revenue, expand our customer base and bring new and exciting products and services to the fast growing market for unified communications," concluded Combs.
>
> [Emphasis added.]

30.    The August 14, 2007 release also contained purported forward guidance, as follows:

**Business Outlook**

Based on current expectations, management is providing the following outlook for the quarter ending September 30, 2007:

- Revenue is expected to be in the range of $29 to $31 million.

- GAAP gross margins are expected to be in the range of 62% to 64%.

- GAAP operating expenses are expected to be in the range of $17.5 to $18.5 million, including approximately $1 million in stock based compensation expense.

31.    Similarly, when the Company filed with the SEC its fiscal year 2007 Form 10-K, for the fiscal year ended June 30, 2007, defendants included Certifications by defendants Combs and Healy, that purported to affirm the accuracy and completeness of ShoreTel's disclosures and reports, in part, as follows:

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO EXCHANGE ACT RULES 13a-14(a) AND 15(d) -14(a), AS ADOPTED**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

1. I have reviewed this annual report on Form 10-K of ShoreTel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

   b. *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: Sept. 27, 2007   /s/ **JOHN W. COMBS**

John W. Combs

Chairman, President and Chief Executive Officer
(Principal Executive Officer)

Date: Sept. 27, 2007   /s/ **MICHAEL E. HEALY**

Michael E. Healy
Chief Financial Officer
(Principal Accounting and Financial Officer)

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, John W. Combs, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of ShoreTel, Inc. for the year ended June 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of ShoreTel, Inc.*

Dated:  Sept. 27, 2007     By:     /s/ **JOHN W. COMBS**

Name:   John W. Combs
Title:    Chairman, President and Chief Exec. Officer
(Principal Executive Officer)

## CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Michael E. Healy, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of ShoreTel, Inc. for the year ended June 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of ShoreTel, Inc.*

Dated: Sept. 27, 2007    By:      /s/ **MICHAEL E. HEALY**

Name:   Michael E. Healy
Title:    Chief Financial Officer
(Principal Accounting and Financial Officer)

[Emphasis added.]

32.     As further evidence of the purported success of the Company's July 2007 IPO, on October 29, 2007, when defendants reported results for the first quarter of fiscal 2008, the period ended September 30, 2007, the Company published a release that also stated, in part, the following:

*"Growing revenue 57% year over year in a market that is growing at 18% to 28% confirms to us that we are gaining market share*. We continue to stay focused on developing leading Pure IP unified communications systems and delivering world class customer satisfaction to our customers globally," said John W. Combs, president and CEO of ShoreTel.

"I am also very pleased to report that we have expanded our relationship with AT&T by signing a master reseller agreement under which AT&T will resell ShoreTel's Pure IP unified communications systems and implementation services. AT&T is one of the world's largest resellers of enterprise telephony and we are excited to have AT&T as a channel partner," concluded Combs.

[Emphasis added.]

33.    The October 29, 2007 release also contained purported forward guidance that stated the following:

**Business Outlook**

Based on current expectations, management is providing the following outlook for the quarter ending December 31, 2007:

\*    Revenue is expected to be in the range of $32 to $35 million.

\*    GAAP gross margins are expected to be in the range of 62% to 64%

\*    GAAP operating expenses are expected to be in the range of $19 to $20 million, including approximately $1.1 million in stock-based compensation expense.

34.    Similarly, when the Company filed with the SEC its fiscal first quarter Form 10-Q, for the fiscal quarter ended September 30, 2007, defendants included Certifications by defendants Combs and Healy, that again purported to affirm the accuracy and completeness of ShoreTel's disclosures and reports,  in part, as follows:

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, John W. Combs, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report on Form 10-Q of ShoreTel, Inc. for the quarter ended September 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *information contained in such Quarterly Report on Form 10-Q fairly presents in all material respects the financial condition and results of operations of ShoreTel, Inc.*

Dated: November 13, 2007       By:    /s/ **JOHN W. COMBS**
                                       Name:  John W. Combs
                                       Title:   Chairman, Pres. and Chief Exec. Officer
                                                (Principal Executive Officer)

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Michael E. Healy, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report on Form 10-Q of ShoreTel, Inc. for the quarter ended September 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that ***information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of ShoreTel, Inc.***

Dated: November 13, 2007       By:    /s/ **MICHAEL E. HEALY**
                                      Name: Michael E. Healy
                                      Title:  Chief Financial Officer
                                              (Principal Accounting and Financial Officer)

[Emphasis added.]

35.    Following the ShoreTel IPO, as shares of the Company traded in the open market to near-highs of about $20.00 per share – over 100% higher than the IPO offering price – on November 19, 2007, ShoreTel announced that certain officers and directors of the Company would conduct a Secondary Offering of an additional 4.4 million shares of common stock.  That day, ShoreTel published a release that stated, in part, the following:

**ShoreTel Announces Secondary Public Offering**

SUNNYVALE, Calif., Nov. 19 /PRNewswire-FirstCall/ - ShoreTel®, Inc. (Nasdaq: SHOR - News), a leading provider of IP telecommunications systems, announced today that certain selling stockholders plan to offer 4.4 million shares of ShoreTel common stock in an underwritten public offering. The Company will not be selling any shares in the offering and will not receive any proceeds from the sale of shares by the selling stockholders.

Lehman Brothers Inc. and J.P. Morgan Securities Inc. are serving as joint bookrunning managers of the offering, and Piper Jaffray & Co., JMP Securities LLC, and Wedbush Morgan Securities Inc. are acting as co-managers. Copies of the prospectus, when available, may be obtained from the prospectus department of Lehman Brothers Inc., c/o Broadridge, 1155 Long Island Avenue, Edgewood, NY 11717 (fax: 1-631-254-7140, or e-mail at qiana.smith@broadridge.com) or from J.P. Morgan Securities Inc., 4 Chase Metrotech Center, CS Level; Brooklyn, New York 11245 (telephone: 1-718-242-8002).

36.    Within days of announcing this Secondary Offering, however, shares of the Company traded to a low of $13.50 per share on November 26, 2007.  Thus, on November 29, 2007, ShoreTel published a release that announced that the Secondary Offering had been cancelled.  At that time, the Company stated that the withdrawal of ShoreTel's Secondary Offering Registration Statement was

1   the result of "*the unwillingness of selling stockholders to sell under the current capital market*

2   *conditions*."

3       37.     Thereafter, to further assure investors that the Company was operating according to

4   plan, on December 5, 2007, ShoreTel also published a release announcing that it had been selected –

5   by a subsidiary of its own outside auditors, Deloitte & Touche – as among the "*2007 Deloitte*

6   *Technology Fast 500*." At that time, the Company published a release that stated, in part, the

7   following:

8           **ShoreTel Named to 2007 Deloitte Technology Fast 500**

9           **ShoreTel Grows 759 Percent Over Five Years**

10          SUNNYVALE, CA, December 5, 2007 - ShoreTel, Inc., (NASDAQ: SHOR), a
            leading provider of Pure IP Unified Communications solutions, today announced it
11          has been named to the Deloitte Technology Fast 500, a ranking of the fastest
            growing technology, media, telecommunications and life sciences companies in
12          North America based on fiscal year revenue growth over a five-year period from
            2002 through 2006. ShoreTel revenues grew from just over $7 million in 2002 to
13          more than $61 million in 2006, an increase of 759 percent. The company was
            ranked 216 out of 500 companies.

14
            *"ShoreTel is delivering on the promise of unified communications for the*
15          *enterprise," said Steve Timmerman, vice president of marketing at ShoreTel.*
            *"Our phenomenal growth is the direct result of great products, top-notch channel*
16          *partners, and an absolute dedication to customer satisfaction."*

17          *Two recent announcements demonstrate ShoreTel's continuing momentum….*
            [Emphasis added.]
18
            **V.    THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF**
19          **SHORETEL IS BELATEDLY DISCLOSED**

20      38.     On January 7, 2008, over 6.0 million shares of ShoreTel traded – over 20 times

21  average daily trading volume – and Company shares plummeted – falling over 50% – after

22  defendants reported results for the second quarter of fiscal 2008 that were well below plan.  At that

23  time, defendants revealed that, for the quarter ended December 31, 2007, the Company would post

24  revenues almost 20% lower than analysts' consensus estimates.   At that time, defendants first

25  belatedly revealed that sales to new customers were substantially lower than expected, and that sales

26  to existing customers was not sufficient to offset these declines.

27      39.     The huge decline in the price of Company shares was evidence that investors

28  concluded that defendants had used existing customers to mask declines in new customer sales, and

that the sudden shortfall in sales was the belated admission that the sales channels could no longer support the Company's excessive inventory, and that defendants could no longer hide declining demand and slowed sales.

40.    As investors realized after the publication of these shocking and belated adverse admissions, the true but undisclosed negative conditions that existed at the time of the July 2007 IPO, and that continued to adversely impact the Company after that time included, in part, the following:

a)    At the time of the IPO, the Company was already evidencing a deterioration across its product line, such that ShoreTel was no longer operating according to plan and such that it was foreseeable that the Company would not be able to achieve earnings, revenue, profits or gross margin projections made by defendants at the time of the Offering;

b)    At the time of the IPO, in an effort to mask reduction in demand and declines in sales, defendants prematurely recognized revenues by pulling sales forward into earlier periods and by stuffing its distribution channel with excess products and inventory – more than could foreseeably be used in the near term – and had taken other measures designed to further prematurely recognizing revenues by draining sales from consecutive periods;

c)    At the time of the IPO, in addition to the reported control deficiencies that existed within the Company, it is now obvious that ShoreTel did not maintain even the minimum standards of good Corporate Governance or controls and procedures that were reasonably necessary to conduct operations, as is required by the SEC and the Company's own internal guidelines and standards of business conduct;

d)    As a result of the foregoing undisclosed problems that existed at the time of the July 2007 ShoreTel IPO, and thereafter throughout the relevant period, guidance sponsored and/or endorsed by defendants was not reasonable or based on the true facts that existed at that time; and

e)    At the time of the July 2007 IPO, defendants had not conducted an adequate due diligence investigation into ShoreTel, that would have revealed many of the issues, and that

would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## VI.     CAUSATION AND ECONOMIC LOSS

41.     In connection with the July 2007 ShoreTel IPO, defendants signed a materially false and misleading Registration Statement and filed with the SEC and made available to shareholders a materially false and misleading Prospectus. These filings were essential in allowing defendants to complete the Initial Public Offering of 9.085 million ShoreTel shares and raised over $86.0 million, and to create a public market for trading in Company stock, immediately thereafter.

42.     On January 7, 2008, when defendants' prior misrepresentations and illegal and improper conduct came to be revealed and was apparent to investors, shares of ShoreTel declined precipitously – evidence that the prior artificial inflation in the price of Company shares was eradicated. As a result of their purchases of ShoreTel stock in connection with the IPO, including those who purchase shares traceable to the Offering in the public markets immediately thereafter, plaintiff and other members of the Class suffered economic losses, i.e. damages under the federal securities laws.

43.     By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of ShoreTel's business and future growth prospects. Within the IPO Prospectus and Registration Statement, defendants repeatedly emphasized the ability of the Company to continue to generate revenues, earnings, profits, expenses and gross margins within expectations sponsored and/or endorsed by defendants. These claims caused and maintained the artificial inflation in ShoreTel's stock at the time of the July 2007 IPO, and thereafter until the truth about the Company was ultimately revealed to investors.

44.     Defendants' false and materially misleading statements caused ShoreTel shares to trade at artificially inflated levels from the time of the IPO, when they were offered at $9.50 per share, until such shares reached an all-time record trading high of almost $20.00 per share in October 2007.

45.     On January 7, 2008, however, as investors learned the truth about the Company, and learned that defendants could not operate the Company according to plan and that ShorTel was

operating well below guidance – which conditions were or should have been obvious to defendants

at the time of the July 2007 IPO – shares of the Company collapsed.  Defendants' belated disclosures

had an immediate, adverse impact on the price of ShoreTel  shares.

46.    These belated revelations also evidenced defendants' prior misrepresentation of

ShoreTel's business prospects due to defendants' false statements.  As investors and the market

ultimately learned, the Company's prior business prospects had been overstated as were the

Company's results of operations.   As this adverse information became known to investors, the prior

artificial inflation was immediately eliminated from ShoreTel's share price, and shareholders were

damaged as a result of this related share price decline.

47.    The economic loss, i.e. damages suffered by Plaintiff and other members of the Class,

was a direct result of defendants' misrepresentations and omissions being revealed to investors, and

the subsequent significant decline in the value of the Company's shares was also the direct result of

defendants' prior misstatements and omissions being revealed, as evidenced by the chart below:



## VII.    CLASS ACTION ALLEGATIONS

48.    This is a class action on behalf of all persons who purchased ShoreTel shares, or

traceable stock, pursuant to the July 2007 Registration Statement and Prospectus (the "Class"),

excluding defendants.  Class members are so numerous that joinder of them all is impracticable.

49.    Common questions of law and fact predominate and include whether defendants: (i) violated the Securities Act; (ii) whether the ShoreTel IPO Registration Statement and Prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

50.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### VIII.   CAUSES OF ACTION

**For Violations of § 11 of the Securities Act (Against All Defendants) and
§ 15 of the Securities Act (Against the Individual Defendants)**

51.    Plaintiff incorporates each and every allegation above as if stated herein.

52.    The Individual Defendants each signed ShoreTel's IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it to investors.  The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

53.    On or about July 3, 2007, the defendants named in this Claim for Relief initiated an IPO of 9.085 million shares of ShoreTel stock  – including the 1.085 million shares allotted to Underwriters in an oversubscription option – at $9.50 per share, for total proceeds of at least $86,307,500.

54.    Each of the statements alleged herein relating to ShoreTel's prospects and financial results made in the July 2007 joint Proxy-Prospectus and Registration Statement were false or misleading when issued.  The true but concealed facts were that ShoreTel was not operating according to plan and was not able to achieve guidance sponsored and/or endorsed by defendants that the time of the IPO which, foreseeable, was and would continue to hinder the Company in the near-term. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

55.    All defendants named in this Claim for Relief, with the exception of ShoreTel, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the

1  statements contained in the Registration Statement and Prospectus at the time it became effective, to

2  assure that those statements were true and that there was no omission to state material facts required

3  to be stated in order to make the statements contained therein not misleading.

4       56.    The officers and directors of ShoreTel who were signatories to the Registration

5  Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus

6  and the Registration Statement.  By virtue of the material misrepresentations contained in the

7  Registration Statement and Prospectus, Plaintiff and the Class have been damaged.

8       57.    By reason of the conduct herein alleged, each Defendant named in this Claim for

9  Relief violated §11 of the Securities Act.

10       58.    The Individual Defendants by reason of their stock ownership and positions with

11  ShoreTel, were and are controlling persons of ShoreTel and are liable under §15 of the Securities

12  Act.

### PRAYER

14  **WHEREFORE**, Plaintiff prays for judgment as follows: declaring this action to be a proper

15  class action; awarding damages, including interest; and such other relief as the Court may deem

16  proper.

### JURY TRIAL DEMANDED

18  Plaintiff hereby demands a trial by jury.

19  DATED:  January 15, 2008         HAGENS BERMAN SOBOL SHAPIRO LLP

*Reed R. Kathrein* with permission by PEB

REED R. KATHREIN

Peter E. Borkon
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Lewis S. Kahn
KAHN GAUTHIER SWICK, LLC
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@kgscounsel.com

Eric J. O'Bell
LAW OFFICES OF ERIC J. O'BELL, LLC
3500 North Hullen Street
Metairie, LA 70002
Telephone: (504) 456-8677
Facsimile: (504) 456-8624

Attorneys for Plaintiff

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

<u>William Watkins</u> (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

      1.    Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

      2.    Plaintiff did not purchase securities of ShoreTel Inc., at the direction of counsel or in order to participate in a private action under the federal securities laws.

      3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

      4.    During the Class Period, plaintiff has executed transactions in the securities of ShoreTel, Inc. as follows. See Attached Schedule.

      5.    In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

      6.    Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: __January 10, 2008__    Name of Plaintiff  _William Watkins_

### Schedule of plaintiff's Transaction(s) in ShoreTel, Inc.

Purchase(s):

| Date | Units | Price |
|---|---|---|
| 07/05/2007 | 100 | $12.58 |
| 07/05/2007 | 200 | 12.95 |
| 01/07/2008 | 100 | 6.3577 |

Sale(s):

| Date | Units | Price |
|---|---|---|
| 01/08/2008 | 400 | $5.5624 |

**LOSS**    01/08/2008    $2,273.85

_William A. Watkins_
**William Watkins**