Kim E. Miller (CA Bar. No. 178370)
**KAHN GAUTHIER SWICK, LLC**
12 E. 41st Street, 12th Floor
New York, NY 10017
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498
Kim.miller@kgscounsel.com

Lewis S. Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498
Lewis.kahn@kgscounsel.com

**Lead Counsel for Lead Plaintiffs & the Class**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **In re SHORETEL, INC. SECURITIES LITIGATION** | **CIVIL ACTION NO. 08-0271 - CRB**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Consolidated Amended Class Action
Complaint – 08-0271-CRB

1.    This is a class action brought by Lead Plaintiffs Loren Swanson and Art Landesman on behalf of the purchasers of ShoreTel, Inc. ("ShoreTel" or the "Company") common stock pursuant to the July 3, 2007 Initial Public Offering ("IPO") of 9.085 million shares of common stock.  In connection with this Offering -- through which 7.9 million shares were sold and an additional 1.185 million shares were sold pursuant to an oversubscription option granted to the underwriters -- defendants raised gross proceeds of $86.3075 million.  The Class Period begins on July 3, 2007, the date of the IPO, and ends on January 7, 2008 when the truth was finally revealed.

2.    ShoreTel, its entire Board of Directors at the time of the IPO and the Lead Underwriters involved in the Offering are each charged with violating the Securities Act by creating and/or distributing a materially untrue and misleading registration statement, which includes the prospectus (collectively, the "Registration Statement") – the document intended to provide the public with detailed information relevant to their decision to invest in the Company – in connection with the IPO.

## INTRODUCTION

3.    On July 3, 2007, ShoreTel conducted an IPO to raise gross proceeds of over $86 million.  As evidenced by the presence of materially untrue statements and omissions in the Registration Statement, defendants failed to conduct an adequate due diligence investigation into the Company prior to the IPO.

4.    In connection with the IPO, the Company issued its Registration Statement that made materially untrue statements and omissions regarding its growth, revenue recognition practices, and net payment terms.  The Company also made materially untrue representations regarding payment for and accounting of demonstration products – millions of dollars of which were actually unaccounted for, causing the Company to overstate inventory and understate costs of sales.  Defendants also negligently understated its bad debt allowances for accounts receivable, decreasing expenses prior to the IPO.

5.      In truth, leading up to the IPO, Defendants were so focused on generating revenue in advance of the IPO that Defendants encouraged pushy and irresponsible sales tactics and demanded that sales personnel make significant sales to keep their jobs.

6.      Directly contrary to the Company's representations in the Registration Statement, at the time of the IPO, the Company failed to disclose that it:

- was unable to complete shipments to its customers prior to their payment becoming due;

- booked all sales as revenue on the day the sales agreement was made, without regard to the fact that many customers would never pay;

- ignored that sales personnel were materially adjusting payment terms from the 30 days written on Company contracts (and beyond the net 30 to 60 days represented in the prospectus and registration statement);

- granted credit to customers without regard to their creditworthiness;

- was not receiving payment from certain customers because those customers did not have the infrastructure ready to support ShoreTel's Systems, had not received their product at the time payment was due, and/or received more generous payment terms from their salesperson than the contract reflected;

- was exhausting its customer base to generate revenue in anticipation of the IPO and would be unable to maintain the reported customer demand;

- had materially understated its allowance for bad debt/doubtful accounts which caused them to report lower-than-actual expenses; and

- failed to account for millions of dollars in demonstration products, resulting in overstated inventory and lower-than-reported costs of sales.

7.      According to multiple former employees of the Company, defendants van Overbeek (Former President and CEO) and Combs (current President and CEO) were extremely focused on bringing ShoreTel to an IPO to the extent that a former Vice President, Confidential Witness ("CW") #1, reported that "everything about how the company was run had to do with pushing for the IPO."

8.      Both defendants van Overbeek and Combs were growing increasingly impatient that the Company was unable to sustain a profitable business and thus pushed the Company

toward an IPO.   According to a former communications employee, CW #2, the Company depleted $100 million in investor capital prior to the IPO and was not generating enough profit to keep investors happy.

9.     CW #1 reported that defendant Combs was "very pushy," driving for sales in ignorance of the result:  that Company employees would generate sales at any cost including extending payments terms, granting credit regardless of credit worthiness, and selling to customers unable to support ShoreTel's product.

10.     Defendants' eagerness to achieve an IPO led to their negligence in failing to discover the Company's undisclosed material problems in existence at the time of the IPO. The due diligence investigation required of Defendants prior to the IPO was either grossly inadequate, or never occurred at all.

11.     As a result, it was not until January 7, 2008, that investors learned the truth about the Company when Defendants announced that the problems which existed at the time of the IPO would result in extremely disappointing results for the second quarter of fiscal 2008 ("2Q:08"), the period ended December 31, 2007, including lower than expected revenues and higher than expected costs and expenses.

12.     Following the publication of these disappointing results, the price of ShoreTel stock collapsed.   ShoreTel shares fell over 50% in a single trading day - - plummeting from a close of over $13.00 per share the prior trading day, to a close of $6.02 per share on January 7, 2008.   ShoreTel also experienced exceptionally heavy trading volume of more than 6 million shares traded -- *over thirty times* the Company's recent average daily trading volume.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k and 77o).   Jurisdiction is conferred by §22 of the Securities Act, (15 U.S.C. § 77v).

14.     Venue is proper pursuant to §22 of the Securities Act , as the Company maintains its executive offices and principle place of business in this District, and/or the Individual

1  Defendants and Underwriter Defendants conduct business in this district, and the wrongful

2  conduct took place in, this District.

3                                    **THE PARTIES**

4  **Plaintiffs**

5          15.    Court appointed Lead Plaintiffs Loren Swanson and Art Landesman purchased

6  shares of ShoreTel common stock pursuant and/or traceable to the Company's materially untrue

7  and misleading Registration Statement and Prospectus issued by Defendants in connection with

8  the July 2007 IPO.

9  **Corporate Defendant**

10         16.    Defendant ShoreTel is a Delaware corporation founded in 1996 and

11 headquartered in Sunnyvale, California.  ShoreTel and its subsidiaries provide switch-based

12 Internet protocol telecommunications systems primarily for domestic enterprises. ShoreTel

13 enables companies to integrate all communications (voice, data, and messaging) with their

14 business processes. ShoreTel is headquartered in Sunnyvale, California, and has regional offices

15 in the United Kingdom, Sydney, Australia and Munich, Germany.  The Company sells its

16 systems through a network of 470 channel partners.

17 **Individual Defendants**

18         17.    The individuals identified as defendants in subparagraphs (a) - (i) below, are

19 referred to collectively herein as the "Individual Defendants."   The Individual Defendants are

20 each liable for the untrue statements and omissions contained in the Registration Statement, as

21 alleged herein, both because they are responsible for making such statements as signatories to the

22 Registration Statement, and because those statements were "group-published" information.  The

23 Individual Defendants include the following:

24         (a)    Defendant John W. Combs ("Combs") was Chairman of the Board of

25 Directors, Chief Executive Officer, and President and Co-Founder of ShoreTel at the time of the

26 IPO.  Defendant Combs signed the materially untrue and misleading Registration Statement.

27

28

Consolidated Amended Class Action                4
Complaint – 08-0271-CRB

(b)    Defendant Michael E. Healy ("Healy") was the Company's Chief Financial Officer at the time of the IPO. Defendant Healy signed the materially untrue and misleading Registration Statement.

(c)    Defendant Edwin Basart ("Basart") is a Founder of the Company, was its Chief Technology Officer and a member of the Board of Directors of ShoreTel at the time of the IPO. Defendant Basart signed the materially untrue and misleading Registration Statement.

(d)    Defendant Mark F. Bregman ("Bregman") was a director of the Company at the time of the IPO. Defendant Bregman signed the materially untrue and misleading Registration Statement.

(e)    Defendant Gary J. Daichendt ("Daichendt") was a director of the Company at the time of the IPO. Defendant Daichendt signed the materially untrue and misleading Registration Statement.

(f)    Defendant Kenneth D. Denman ("Denman") was a director of the Company at the time of the IPO. Defendant Denman signed the materially untrue and misleading Registration Statement.

(g)    Defendant Charles D. Kissner ("Kissner") was a director of the Company at the time of the IPO. Defendant Kissner signed the materially untrue and misleading Registration Statement

(h)    Defendant Thomas van Overbeek ("Overbeek") was a director of the Company at the time of the IPO. Defendant Overbeek signed the materially untrue and misleading Registration Statement. Prior to becoming a director with the Company, van Overbeek served as the CEO and President of ShoreTel from February 2002 to July 2004 and as a consultant to ShoreTel from December 2001 to February 2002.

(i)    Defendant Edward F. Thompson ("Thompson") was a director of the Company at the time of the IPO. Defendant Thompson signed the materially untrue and misleading Registration Statement.

**Underwriter Defendants**

1    18.    In connection with the IPO, defendants Lehman Brothers, Inc. ("Lehman Bros.")

2   and J.P. Morgan Securities, Inc**.** ("J.P. Morgan") acted as the Lead Underwriters of the Offering

3   – each distributing over 2.7 million shares of ShoreTel stock to investors and initiating the first

4   public market for ShoreTel shares (not including 1.185 million shares sold to underwriters

5   pursuant to an oversubscription option).

6    19.    In connection with the IPO, the Lead Underwriters were paid at least $0.665 per

7   share in connection with the sale – each reaping over $1.8 million in gross fees (excluding

8   additional fees earned pursuant to the oversubscription option).

9   **MATERIALLY UNTRUE & MISLEADING STATEMENTS AND OMISSIONS**
    **IN THE REGISTRATION STATEMENT**
10

11   **Materially Untrue and Misleading Statements Regarding the Company's Growth**

12    20.    The Registration Statement portrayed ShoreTel as a company that had

13   experienced -- and was continuing to experience -- significant growth in revenues, earnings,

14   gross margins, and other positive key financial and operational metrics.  It reported Company

15   revenues that had more than tripled in just two years. In this regard, the Registration Statement

16   stated, in part, the following:

17        **We have experienced significant growth in recent periods, with our**
         **total revenue growing from $18.8 million for 2004 to $61.6 million for**
18       **2006**. This growth in revenue has largely been driven by **increased**
         **demand for IP telecommunications systems from new enterprise**
19       **customers,** as well as sales of additional products to our installed
         enterprise customer base.
20

21   (emphasis added).

22    21.    In truth, rather than a dramatic increase in demand, CW #3, a former sales

23   employee, reported that "there was intense pressure to sell" at the Company in an effort to please

24   investors and generate revenue for the IPO. In this regard, CW #3 reported, the Company offered

25   customers "significant discounts" that were "questionable" according to former employees who

26   worked at the Company during the relevant time period.

27    22.    CW #4 reported that because of intense pressure from Defendants, Company sales

28   staff sold phone systems to customers whose countries and/or businesses lacked the

infrastructure necessary to support the systems by enticing them with steep discounts and extended payment terms. Sales personnel were so aggressive that customers were often left with systems that they were unable to use, let alone pay for.

23.    As a result of forceful sales tactics, the Company experienced exaggerated growth as it exhausted its customer base to book sales prior to the IPO. Each of the foregoing factors were reasonably likely to have a material adverse effect on ShoreTel's operating results and was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

**Materially Untrue Statements Regarding the Company's Actual Payment Terms & Associated Revenue Recognition Practices**

24.    Consistent with GAAP, Defendants stated, in part:

> **Payment terms generally range from net 30 to net 60 days**. **In the event payment terms are extended materially from our standard business practices**, the fees are deemed not to be fixed or determinable and **revenue is recognized when the payments become due.**

(emphasis added).

25.    GAAP permits the recognition of revenue only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and collectability is probable. SEC's Staff Accounting Bulletin ("SAB") No. 104. Moreover, in order for revenue to be recognized, it must be earned and realized or realizable. Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶83. Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. *Id.* Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Concepts Statement No. 5, ¶83. If collectability is not reasonably assured, revenues should be recognized on the basis of cash received. Concepts Statement No. 5, ¶84g; see also Accounting Research Bulletin No. 43

1
2
3
4
5

("ARB 43"), (June 1943) Ch. 1A, ¶1; Accounting Principles Board Opinion No. 10 ("APB 10") Omnibus Opinion-1966 (December 1966) ¶12.    If payment is subject to a significant contingency, revenue recognition is improper.  Statement of Financial Accounting Standards No. 5 ("SFAS 5"), Accounting for Contingencies (March 1975).

6
7
8
9
10
11
12

26.    Nevertheless, ShoreTel's IPO Registration Statement failed to disclose the fact that sales personnel were materially extending payment terms, and that the Company booked sales as revenue as soon as an agreement was made with the customer, regardless of the customer's ability, or intention, to pay.  Contrary to the statements in the Registration Statement, regarding payment terms (*see* ¶24 above), CW #4 reported that sales personnel engaged in a pattern and practice to orally extend payment terms beyond net 30 to 60 days to book sales and generate commission.

13
14
15
16
17
18

27.    When payment became due under the sales contracts, usually at net 30 days, customers were contacted for nonpayment and were shocked to hear that payment was due. Customers purchased ShoreTel systems prior to having the infrastructure to support such systems merely to take advantage of steep discounts and were promised by sales personnel that the payment terms would not apply to them. Many customers had not yet received their complete systems when contacted for full payment.

19
20
21
22
23

28.    Indeed, according to CW #4, a former employee working in the Company's credit department, several customers owed approximately $500,000 to ShoreTel at the time of the IPO and were well past their 30-day payment obligation.  These customers gave no sign that they indeed to pay and other customers outwardly refused to pay.

24
25
26
27
28

29.    Despite these facts, according to CW #4, the employee responsible for obtaining payment from these customers, s/he was not permitted to recall the goods, and instead was instructed by Defendants to continue to press for payment, regardless of the customers' desire or intention to pay.  Keeping a razor-sharp focus on achieving the goal of an IPO, Defendants turned a blind eye to the fact that sales personnel were succumbing to Defendants' pressure to

meet sales metrics by offering unauthorized extensions on payment terms, as weekly sales meetings revealed.

30.    In contrast to the representations in the Registration Statement and in disregard of the fact that sales personnel were materially extending payment terms, the Company booked sales as revenue as soon as an agreement was made with the customer, regardless of the customer's ability, or intention, to pay.  Indeed, at the time of the IPO, several customers each owed approximately $500,000 to ShoreTel and were well past their 30-day payment obligation. These customers gave no sign that they intended to pay and other customers outwardly refused to pay.  Accordingly, the Registration Statement included materially inflated operating results, as a result recognizing revenue when collectability was not reasonably assured.

**Materially Untrue Statements & Omissions Regarding the Company's Issuance of Credit & Associated Revenue Recognition**

31.    In explaining the Company's revenue recognition practice, Defendants addressed its issuance of credit to channel partners, stating, in part:

> We assess the ability to collect from channel partners based on a number of factors, including creditworthiness and past transaction history. **If the channel partner is not deemed creditworthy, we defer all revenue from the arrangement until payment is received and all other revenue recognition criteria have been met.**

(emphasis added).

32.    In truth, credit was granted freely and without regard to customers' credit worthiness.  Many of ShoreTel's delinquent customers had credit lines that were depleted or frozen because they placed large orders and refused to pay.  Though the Company's policy had been to review customers' credit on a semi-annual and annual basis, certain of the Company's customers had not had their credit reviewed for years.  According to CW #4, attempts by an employee to get credit records for customers were shut down by Company executives who directed the employee to extend credit "without question." The Company continued to book all of its agreements as sales the day the sale was made – regardless of customers' creditworthiness or sales personnel's extension of payment terms.  The Company's practice was simple: extend credit to any customer willing to buy and book revenues immediately.

**Materially Untrue and Misleading Statements and Omissions Regarding the Company's Monitoring of Key Financial Metrics**

33.    The Registration Statement also reported that Defendants "monitor a number of key metrics to help forecast growth, establish budgets, measure the effectiveness of sales and marketing efforts and measure operational effectiveness." Such metrics included initial and repeat sales orders, deferred revenue, gross margin, and operating expense management.

34.    In truth, however, CW #1 and CW #2 both reported that former ShoreTel CFO John Finegan was not in control of or able to monitor the Company's financials.  According to CW #1, when approached by a marketing executive about nonpayment of vendors, Finegan was defensive and showed financial records suggesting that checks to the vendors had gone out, but in fact, they had not.  In such cases, vendors did not receive payment until roughly a month after Finegan was questioned.

35.    In addition, the Company was unable to reasonably forecast its growth or measure its effectiveness of sales and marketing efforts as evidenced by the untrue and misleading statements and omissions regarding its financial results and growth discussed in ¶¶20-23, above and the Company's failure to reach its own guidance or analyst's expectations for sales for 2Q:08.

36.    Further, the Company's inability to track financial metrics also led the Company to under-allocate funds for its allowance for doubtful accounts (*see* ¶¶38-42 below) and to fail to write off costs of sales associated with shipping demonstration and loaner phones for free (*see* ¶¶43-45 below) –  both caused the Company to materially understate expenses.

37.    Though the Company demoted Finegan to Vice President of Finance two months prior to the IPO, Defendants failed to disclose in its Registration Statement that the Company faced inherent financial problems as a result of Finegan's mismanagement.

**Defendants Materially Understated the Accounts Receivable Allowance**

38.    Concerning the Company's allowance for doubtful accounts, Defendants reported an allowance of $256,000 for the period ending March 31, 2007 and stated that:

> We review our allowance for doubtful accounts on a quarterly basis by assessing individual accounts receivable that materially exceed due dates. Risk assessment

for these accounts includes historical collections experience with the specific account and with our similarly situated accounts coupled with other related credit factors that may evidence a risk of default and loss to us. **Accordingly, the amount of this allowance will fluctuate based upon changes in revenue levels, collection of specific balances in accounts receivable and estimated changes in channel partner credit quality or likelihood of collection.**

(emphasis added).

39.    Statement of Financial Accounting Standards ("SFAS") No. 5, provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated. SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (*i.e.*, greater than a slight chance) that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or a range of loss, or state that such an estimate cannot be made.

40.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that, although disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred." 17 C.F.R. § 210.10-01.

41.    In addition, Concepts Statement No. 5, states "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ."

42.     Despite SEC and GAAP reporting requirements and in contrast to Defendants' statements concerning allowance for doubtful accounts (*see* ¶38 above) and their ability to monitor key financial metrics, the Company materially understated its allowance for bad debts in its Registration Statement.  Despite the fact that Accounts Receivable had *increased* over 60% from the period ending June 30, 2006, the Company *decreased* its allowance for bad debt by over 30%.  Generally, as sales grow, the frequency of nonpayment will increase and so too should the allowances made for such doubtful accounts.  Defendants' decision to decrease its allocation for doubtful accounts was negligent in light of the dramatic increase in accounts receivable, especially with regard to the risk factors present at the time of the IPO including aggressive sales tactics, customers' surprise when asked to pay within 30 days, and the Company's issuance of credit without regard to creditworthiness.

**Materially Untrue and Misleading Statements and Omissions Regarding Accounting for Demonstration Products and Loaners**

43.     The Company also omitted from the Registration Statement material information regarding its use of demonstration products, stating, in relevant part:

> The marketing allowance can also be used by the channel partners to purchase demonstration products from us at greater than the standard discount for products sold to channel partners. Such discounts provided to the channel partners are recorded as a reduction of revenue upon shipment of the demonstration units.

44.     In truth, a number of ShoreTel products were given as "temporary" demonstration products and/or loaners from 2002 through 2007.  However, ShoreTel failed to request that these systems be returned and never charged customers for keeping products.

45.     The basic tenets of GAAP state that an expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated.  Because these demonstration units were often unaccounted for, the Company's inventory was overstated and its costs of sales were understated.  The Registration Statement failed to disclose this millions of dollars of unaccounted for equipment that had never been

invoiced or written-off as a loss.   Accordingly, the financial position and operating results contained in ShoreTel's Registration Statement were materially untrue and misleading.

### The Company's Untrue and Misleading Statements and Omissions Regarding its Growth and Allowances Violate of GAAP and SEC rules

46.    ShoreTel was required to furnish information required by Item 303 of SEC Regulation S-K in its Registration Statement.   Regarding the Company's results of operations, Item 303 required ShoreTel to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

47.    The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . .

48.    In addition, the SEC has indicated (in Interpretive Release No. 34-26831), that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the disclosure:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

49.    These requirements are intended to provide, in one section of a filing, material historical and prospective disclosure enabling investors to assess the financial condition and results of operations of the Company, with particular emphasis on the registrant's prospects for the future. As the Securities Act Release No. 6711 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company

through the eyes of management by providing both a short and long-term analysis of the business of the company . . .

50.    "It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company." Securities Act Release No. 6349, supra n. 5, at 964.

51.    Nonetheless, ShoreTel's IPO Registration Statement failed to disclose that the Company's increases in revenue were not sustainable, because of, among other things, the Company offering customers "significant discounts" to accelerate revenues.  It also failed to discuss the Company's problematic reduction in its allowance for bad debt despite apparent trends in accounts receivable growth and Defendants' liberal granting of high-risk credit.

### THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF THE COMPANY IS BELATEDLY DISCLOSED

52.    On January 7, 2008, the Company announced that it "fell short of [its] expectations" as Defendants  revealed that "sales to new customers declined" and reported results for the second quarter of fiscal quarter ended December 31, 2007 that were well below plan.  On that day, Defendants revealed that the Company would post revenues almost 20% lower than analysts' consensus estimates and millions below their previously issued guidance for the quarter.    At that time, Defendants first revealed that sales to new customers were substantially lower than expected, and that sales to existing customers were not sufficient to offset these declines.

53.    These belated revelations evidenced Defendants' prior misrepresentation of ShoreTel's business prospects.  As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations.

54.    As this adverse information became known to investors, the prior artificial inflation was immediately eliminated from ShoreTel's share price, and shareholders were damaged as a result of this related share price decline.  Over six million shares of ShoreTel

traded, more than 20 times the average daily trading volume, while the stock plummeted over 50% from a close of $13.00 per share the prior trading day, to a close of $6.02 per share on January 7, 2008.

## ADDITIONAL ALLEGATIONS REGARDING
## THE INDIVIDUAL DEFENDANTS

55.    Each of the Individual Defendants, by virtue of their high-level positions with the Company (as well as those high-level positions with the Company's subsidiaries and affiliates), directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the untrue and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

56.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock violated these specific requirements and obligations.

57.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the Offering.  Each Individual Defendant was provided with copies of the documents alleged

Consolidated Amended Class Action                    15
Complaint – 08-0271-CRB

herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## ADDITIONAL ALLEGATIONS REGARDING
## THE UNDERWRITER DEFENDANTS

58.    Like the Individual Defendants, it is also appropriate to treat the Underwriter Defendants as a group for pleading purposes and to presume that the untrue, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Moreover, because of the Underwriter Defendants' positions, they each had access to the adverse undisclosed information about the Company's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

## NO SAFE HARBOR

59.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the untrue statements of material fact or material omissions pleaded in this complaint. The vast majority of the specific statements pleaded herein were not identified as "forward-looking statements" in the Prospectus and/or Registration Statement.

60.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

61.    Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those untrue forward-looking statements because at the time each of those statements was made, the forward-looking statement was authorized and/or approved by an executive officer of the Company.

## CLASS ACTION ALLEGATIONS

62.    This is a class action on behalf of all persons who purchased ShoreTel shares, or traceable stock, pursuant to the July 2007 Registration Statement (the "Class"), excluding defendants. The Class period ends on January 7, 2008 when the true facts were fully revealed. Class members are so numerous that joinder of them all is impracticable.

63.    Common questions of law and fact predominate and include whether Defendants: (i) violated the Securities Act; (ii) whether the Registration Statement contained materially untrue and misleading statements and omissions concerning, among other things, the Company's ability to complete shipments to customers before payment became due; the Company's practice of booking sales as revenue regardless of customers' ability or intention to pay; net payment terms and associated revenue recognition policies; grant of customer credit; Company growth and demand for ShoreTel's products; the Company's allowance for bad debt/doubtful accounts; and its accounting for demonstration and loaner products; and (iii) the extent of and appropriate measure of damages.

64.    Plaintiffs' claims are typical of those of the Class.  Like the Class, Plaintiffs invested in ShoreTel common stock during the Class Period when it was overvalued because of the Registration Statement's failure to disclose that the Company would not be able to sustain growth and was unable to monitor key financial metrics.

65.    Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I

### For Violations of §11 of the Securities Act Against ShoreTel

66.    Plaintiffs incorporate each and every allegation above as if stated herein.

67.    On or about July 3, 2007, issuer ShoreTel completed an IPO of 9.085 million shares of ShoreTel common stock priced at $9.50 per share, for total proceeds of at least $86 million.

68.    Each of the statements alleged herein relating to ShoreTel's prospects and financial results made in the Registration Statement were materially untrue and/or misleading when issued.  The true but concealed facts were that ShoreTel was not operating according to plan and that the Company would be unable to sustain its levels of growth because discounts provided to customers were causing accelerated sales.  Further, the Company would be unable to collect payment from a number of these customers even though their sales had already been booked as revenue.  These adverse conditions had already severely and adversely affected results of the Company prior to the IPO and would continue to hinder the Company in the foreseeable near-term.

69.    ShoreTel is absolutely liable for the material misstatements and omissions in the registration statement and prospectus issued by it.

70.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

71.    By reason of the conduct herein alleged, the ShoreTel violated §11 of the Securities Act.

## COUNT II

### For Violations of §11 of the Securities Act Against the Individual Defendants

72.    Plaintiffs incorporate each and every allegation above as if stated herein.

73.    The Individual Defendants each signed ShoreTel's Registration Statement with the SEC and distributed the Registration Statement/Prospectus to investors.

74.    The Individual Defendants owed to the purchasers of the stock, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the

statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

75.    The officers and directors of ShoreTel were signatories to the Registration Statement.  By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiffs and the Class have been damaged.

76.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

77.    By reason of the conduct herein alleged, each of the Individual Defendants violated §11 of the Securities Act.

## COUNT III

**For Violations of §11 of the Securities Act Against the Underwriter Defendants**

78.    Plaintiffs incorporate each and every allegation above as if stated herein.

79.    The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

80.    The Underwriter Defendants owed to the purchasers of the stock, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

81.    The Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement.   By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiffs and the Class have been damaged.

82.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

83.    By reason of the conduct herein alleged, each of the Underwriter Defendants violated §11 of the Securities Act.

## COUNT IV

**For Violations of §15 of the Securities Act Against the Individual Defendants**

84.    Plaintiffs repeat and re-allege each and every allegation contained above.

85.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

86.    Each of these Individual Defendants was a control person of ShoreTel by virtue of his or her position as a director and/or senior officer of ShoreTel or as a result of its large equity interest.  The defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of ShoreTel.

87.    Each of the Individual Defendants is liable for violating §15 of the 1933 Act based on their ability to control ShoreTel, which violated §11 of the 1933 Act as alleged in Count I above. This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding ShoreTel's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the Registration Statement and Prospectus.

88.    The Individual Defendants, by reason of their stock ownership and/or positions with ShoreTel, were controlling persons of the Company and are liable under §15 of the Securities Act.

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PRAYER

**WHEREFORE**, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 27, 2008                                  by:    /s/ Kim E. Miller

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 E. 41st Street, 12th Floor
New York, NY 10017
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

Lewis S. Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498


**Lead Counsel for Lead Plaintiffs & the Class**

-and-

Peter Borkon
Reed Kathrein
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Local Counsel for Lead Plaintiffs & the Class

-and-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Eric J. O'Bell
**LAW OFFICES OF ERIC J. O'BELL, LLC**
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone: (504) 456-8677
Facsimile: (504) 456-8624

**Additional counsel for Lead Plaintiffs and the Class**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF SERVICE**

I hereby certify that this Amended Complaint was filed through the ECF system on June 27, 2008 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


_____/s/ Kim E. Miller_____