1  Kim E. Miller (CA Bar. No. 178370)
   **KAHN GAUTHIER SWICK, LLC**
2  12 E. 41st Street, 12th Floor
3  New York, NY 10017
   Telephone: (504) 455-1400
4  Facsimile:  (504) 455-1498
   Kim.miller@kgscounsel.com
5

6  Lewis S. Kahn
   **KAHN GAUTHIER SWICK, LLC**
7  650 Poydras Street, Suite 2150
8  New Orleans, LA  70130
   Telephone: (504) 455-1400
9  Facsimile:  (504) 455-1498
   Lewis.kahn@kgscounsel.com
10

11 **Lead Counsel for Lead Plaintiffs & the Class**

12
                 **UNITED STATES DISTRICT COURT**
13              **NORTHERN DISTRICT OF CALIFORNIA**

14

15                                              )  **CIVIL ACTION NO. 08-0271 -**
                                                )  **CRB**
16                                              )
                                                )
17 **In re SHORETEL, INC. SECURITIES**          )  **SECOND CONSOLIDATED**
   **LITIGATION**                               )  **AMENDED CLASS ACTION**
18                                              )  **COMPLAINT**
                                                )  **FOR VIOLATIONS OF**
19                                              )  **FEDERAL SECURITIES LAWS**
                                                )
20                                              )
                                                )  **CLASS ACTION**
21                                              )
                                                )
22                                              )
                                                   **JURY TRIAL DEMANDED**
23

24

25

26

27

28

1.      This is a class action brought by Lead Plaintiffs Loren Swanson and Art Landesman on behalf of the purchasers of ShoreTel, Inc. ("ShoreTel" or the "Company") common stock pursuant to the July 3, 2007 Initial Public Offering ("IPO") of 9.085 million shares of common stock.  In connection with this IPO -- through which 7.9 million shares were sold and an additional 1.185 million shares were sold pursuant to an oversubscription option granted to the underwriters -- defendants raised gross proceeds of $86.3075 million.  The Class Period begins on July 3, 2007, the date of the IPO, and ends on January 29, 2008 when the truth was finally revealed.

2.      ShoreTel, its entire Board of Directors at the time of the IPO and the Lead Underwriters involved in the IPO are each charged with violating the Securities Act by creating and/or distributing a materially untrue and misleading registration statement, which includes the prospectus (collectively, the "Registration Statement") – the document intended to provide the public with detailed information relevant to their decision to invest in the Company – in connection with the IPO.

## INTRODUCTION

3.      On July 3, 2007, ShoreTel conducted an IPO to raise gross proceeds of over $86 million.  As evidenced by the presence of materially untrue statements and omissions in the Registration Statement, defendants failed to conduct an adequate due diligence investigation into the Company prior to the IPO.

4.      In connection with the IPO, the Company issued its Registration Statement that made materially untrue statements and omissions regarding its growth, revenue recognition practices, and net payment terms.  The Company also made materially untrue representations regarding payment for and accounting of demonstration products – millions of dollars of which were actually unaccounted for, causing the Company to overstate inventory and understate costs of sales.  Defendants made materially untrue and misleading statements about its ability to and method for accounting for bad debt allowances.

5.      In truth, leading up to the IPO, defendants were so focused on generating revenue in advance of the IPO that Defendants encouraged pushy and irresponsible sales tactics and demanded that sales personnel make significant sales to keep their jobs.

6.      Directly contrary to the Company's representations in the Registration Statement, at the time of the IPO, the Company failed to disclose that it:

- was unable to complete shipments to its customers prior to their payment becoming due;

- booked all sales as revenue on the day the sales agreements were made, without regard to the fact that many customers would never pay;

- ignored that sales personnel were materially adjusting payment terms from the 30 days written on Company contracts (and beyond the net 30 to 60 days represented in the Registration Statement);

- granted credit to customers without regard to their creditworthiness;

- was not receiving payment from certain customers because those customers did not have the infrastructure ready to support ShoreTel's Systems, had not received their product at the time payment was due, and/or received more generous payment terms from their Company salesperson than the contract reflected;

- was exhausting its customer base to generate revenue in anticipation of the IPO and would be unable to maintain the reported customer demand;

- had materially understated its allowance for bad debt/doubtful accounts which caused the Company to report lower-than-actual expenses; and

- failed to account for millions of dollars in demonstration products, resulting in overstated inventory and lower-than-reported costs of sales.

7.      According to multiple former employees of the Company, defendants van Overbeek (Former President and CEO) and Combs (current President and CEO) were extremely focused on bringing ShoreTel to an IPO to the extent that a former Vice President, Confidential Witness ("CW") #1, reported that "everything about how the company was run had to do with pushing for the IPO."

8.      Both defendants van Overbeek and Combs were growing increasingly impatient that the Company was unable to sustain a profitable business and thus pushed the Company

toward an IPO.  According to a former communications employee, CW #2, the Company depleted $100 million in investor capital prior to the IPO and was not generating enough profit to keep investors happy.

9.    CW #1 reported that defendant Combs was "very pushy," driving for sales in ignorance of the result:  that Company employees would generate sales at any cost including extending payments terms, granting credit regardless of credit worthiness, and selling to customers unable to support ShoreTel's product.

10.    Defendants' eagerness to achieve an IPO led to their negligence in failing to discover the Company's undisclosed material problems in existence at the time of the IPO. The due diligence investigation required of Defendants prior to the IPO was either grossly inadequate, or never occurred at all.

11.    As a result, it was not until January 29, 2008, after a series of partial disclosures beginning on September 27, 2007, that investors learned the truth about the Company as Defendants announced a lack of internal controls and that the problems which existed at the time of the IPO would result in extremely disappointing results for the second quarter of fiscal 2008 ("2Q:08"), the period ended December 31, 2007, including lower than expected revenues and higher than expected costs and expenses.

12.    During this period, the value of ShoreTel stock fell from a close of $15.68 on September 26, 2007, the day before the first partial disclosure, to close over 67% lower at $5.04 on January 30, 2008 after the truth was fully revealed.

**JURISDICTION AND VENUE**

13.    The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k and 77o).  Jurisdiction is conferred by §22 of the Securities Act, (15 U.S.C. § 77v).

14.    Venue is proper pursuant to §22 of the Securities Act , as the Company maintains its executive offices and principle place of business in this District, and/or the Individual Defendants and Underwriter Defendants conduct business in this District, and the wrongful conduct took place in, this District.

Second Consolidated Amended Class Action
Complaint – 08-0271-CRB                               3

## THE PARTIES

**Plaintiffs**

15.     Court appointed Lead Plaintiffs Loren Swanson and Art Landesman purchased shares of ShoreTel common stock pursuant and/or traceable to the Company's materially untrue and misleading Registration Statement and Prospectus issued by Defendants in connection with the July 2007 IPO.

**Corporate Defendant**

16.     Defendant ShoreTel is a Delaware corporation founded in 1996 and headquartered in Sunnyvale, California.  ShoreTel and its subsidiaries provide switch-based Internet protocol telecommunications systems primarily for domestic enterprises. ShoreTel is headquartered in Sunnyvale, California, and has regional offices in the United Kingdom, Sydney, Australia and Munich, Germany.

**Individual Defendants**

17.     The individuals identified as defendants in subparagraphs (a) - (i) below, are referred to collectively herein as the "Individual Defendants."   The Individual Defendants are each liable for the untrue statements and omissions contained in the Registration Statement, as alleged herein, both because they are responsible for making such statements as signatories to the Registration Statement, and because those statements were "group-published" information. The Individual Defendants include the following:

(a)     Defendant John W. Combs ("Combs") was Chairman of the Board of Directors, Chief Executive Officer, and President and Co-Founder of ShoreTel at the time of the IPO.  Defendant Combs signed the materially untrue and misleading Registration Statement.

(b)     Defendant Michael E. Healy ("Healy") was the Company's Chief Financial Officer at the time of the IPO.  Defendant Healy signed the materially untrue and misleading Registration Statement.

(c)     Defendant Edwin Basart ("Basart") is a Founder of the Company, was its Chief Technology Officer and a member of the Board of Directors of ShoreTel at the time of the IPO.  Defendant Basart signed the materially untrue and misleading Registration Statement.

(d)     Defendant Mark F. Bregman ("Bregman") was a director of the Company at the time of the IPO.   Defendant Bregman signed the materially untrue and misleading Registration Statement.

(e)     Defendant Gary J. Daichendt ("Daichendt") was a director of the Company at the time of the IPO.   Defendant Daichendt signed the materially untrue and misleading Registration Statement.

(f)     Defendant Kenneth D. Denman ("Denman") was a director of the Company at the time of the IPO.   Defendant Denman signed the materially untrue and misleading Registration Statement.

(g)     Defendant Charles D. Kissner ("Kissner") was a director of the Company at the time of the IPO.   Defendant Kissner signed the materially untrue and misleading Registration Statement

(h)     Defendant Thomas van Overbeek ("Overbeek") was a director of the Company at the time of the IPO.   Defendant Overbeek signed the materially untrue and misleading Registration Statement.   Prior to becoming a director with the Company, van Overbeek served as the CEO and President of ShoreTel from February 2002 to July 2004 and as a consultant to ShoreTel from December 2001 to February 2002.

(i)     Defendant Edward F. Thompson ("Thompson") was a director of the Company at the time of the IPO.   Defendant Thompson signed the materially untrue and misleading Registration Statement.

**Underwriter Defendants**

18.     In connection with the IPO, defendants Lehman Brothers, Inc. ("Lehman Bros.") and J.P. Morgan Securities, Inc**.** ("J.P. Morgan") acted as the Lead Underwriters of the IPO – each distributing over 2.7 million shares of ShoreTel stock to investors and initiating the first public market for ShoreTel shares (not including 1.185 million shares sold to underwriters pursuant to an oversubscription option).

19.     In connection with the IPO, the Lead Underwriters were paid at least $0.665 per share in connection with the sale – each reaping over $1.8 million in gross fees (excluding additional fees earned pursuant to the oversubscription option).

## MATERIALLY UNTRUE & MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

### Materially Untrue and Misleading Statements Regarding the Company's Growth

20.     The Registration Statement portrayed ShoreTel as a company that had experienced -- and was continuing to experience -- significant growth in revenues, earnings, gross margins, and other positive key financial and operational metrics.  It reported Company revenues that had more than tripled in just two years. In this regard, the Registration Statement stated, in part, the following:

> **We have experienced significant growth in recent periods, with our total revenue growing from $18.8 million for 2004 to $61.6 million for 2006**. This growth in revenue has largely been driven by **increased demand for IP telecommunications systems from new enterprise customers,** as well as sales of additional products to our installed enterprise customer base.

(Emphasis added).

21.     In truth, rather than a dramatic increase in demand, CW #3, a former sales employee, reported that "there was intense pressure to sell" at the Company in an effort to please investors and generate revenue for the IPO. In this regard, CW #3 reported, the Company offered channel partners "significant discounts" that were "questionable."

22.     CW #4, a former employee working in the Company's credit department, reported that because of intense pressure from Defendants, Company sales staff sold phone systems to customers whose countries and/or businesses lacked the infrastructure necessary to support the systems by enticing them with steep discounts and extended payment terms.  Sales personnel were so aggressive that customers were often left with systems that they were unable to use, let alone pay for.

23.     As a result of forceful sales tactics, the Company experienced exaggerated growth as it exhausted its customer base to book sales prior to the IPO.  Each of the foregoing factors was reasonably likely to have a material adverse effect on ShoreTel's operating results

and was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

**Materially Untrue Statements Regarding the Company's Actual Payment Terms & Associated Revenue Recognition Practices**

24.     Consistent with GAAP, Defendants stated, in part:

> **Payment terms generally range from net 30 to net 60 days**. **In the event payment terms are extended materially from our standard business practices**, the fees are deemed not to be fixed or determinable and **revenue is recognized when the payments become due.**

(Emphasis added).

25.     GAAP permits the recognition of revenue only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and collectability is probable.   SEC's Staff Accounting Bulletin ("SAB") No. 104.   Moreover, in order for revenue to be recognized, it must be earned and realized or realizable.   Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶83.   Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.   *Id*.   Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Concepts Statement No. 5, ¶83.   If collectability is not reasonably assured, revenues should be recognized on the basis of cash received.   Concepts Statement No. 5, ¶84g; *see also* Accounting Research Bulletin No. 43 ("ARB 43"), (June 1943) Ch. 1A, ¶1; Accounting Principles Board Opinion No. 10 ("APB 10") Omnibus Opinion-1966 (December 1966) ¶12.   If payment is subject to a significant contingency, revenue recognition is improper.   Statement of Financial Accounting Standards No. 5 ("SFAS 5"), Accounting for Contingencies (March 1975).

26.     Nevertheless, ShoreTel's IPO Registration Statement failed to disclose the fact that sales personnel were materially extending payment terms, and that the Company booked sales as revenue as soon as an agreement was made with the customer, regardless of the customer's ability, or intention, to pay.   Contrary to the statements in the Registration Statement, regarding payment terms (*see* ¶24 above), CW #4 reported that sales personnel engaged in a pattern and practice to orally extend payment terms beyond net 30 to 60 days to book sales and generate commission.

27.     When payment became due under the sales contracts, usually at net 30 days, customers were contacted for nonpayment and were shocked to hear that payment was due. Customers purchased ShoreTel systems prior to having the infrastructure to support such systems merely to take advantage of steep discounts and were promised by sales personnel that the payment terms would not apply to them. Many customers had not yet received their complete systems when contacted for full payment.

28.     Indeed, according to CW #4, several customers owed approximately $500,000 to ShoreTel at the time of the IPO and were well past their 30-day payment obligation.   These customers gave no sign that they intended to pay and other customers outwardly refused to pay.

29.     Despite these facts, according to CW #4, the employee responsible for obtaining payment from these customers, s/he was not permitted to recall the goods, and instead was instructed by Defendants to continue to press for payment, regardless of the customers' desire or intention to pay.   Keeping a razor-sharp focus on achieving the goal of an IPO, Defendants turned a blind eye to the fact that sales personnel were succumbing to Defendants' pressure to meet sales metrics by offering unauthorized extensions on payment terms, as weekly sales meetings revealed.

30.     In contrast to the representations in the Registration Statement and in disregard of the fact that sales personnel were materially extending payment terms, the Company booked sales as revenue as soon as an agreement was made with the customer, regardless of the customer's ability, or intention, to pay. Accordingly, the Registration Statement included

materially inflated operating results, as a result recognizing revenue when collectability was not reasonably assured.

**Materially Untrue Statements and Omissions Regarding the Company's Issuance of Credit and Associated Revenue Recognition**

31.     In explaining the Company's revenue recognition practice, Defendants addressed its issuance of credit to channel partners, stating, in part:

> We assess the ability to collect from channel partners based on a number of factors, including creditworthiness and past transaction history. **If the channel partner is not deemed creditworthy, we defer all revenue from the arrangement until payment is received and all other revenue recognition criteria have been met.**

(Emphasis added).

32.     In truth, credit was granted freely and without regard to customers' credit worthiness.  Many of ShoreTel's delinquent customers had credit lines that were depleted or frozen because they placed large orders and refused to pay.  Though the Company's policy had been to review customers' credit on a semi-annual and annual basis, certain of the Company's customers had not had their credit reviewed for years.  According to CW #4, attempts by an employee to get credit records for customers were shut down by Company executives who directed the employee to extend credit "without question." The Company continued to book all of its agreements as sales the day the sale was made – regardless of customers' creditworthiness or sales personnel's extension of payment terms.  The Company's practice was simple: extend credit to any customer willing to buy and book revenues immediately.

**Materially Untrue and Misleading Statements and Omissions Regarding the Company's Monitoring of Key Financial Metrics**

33.     The Registration Statement also reported that Defendants "monitor a number of key metrics to help forecast growth, establish budgets, measure the effectiveness of sales and marketing efforts and measure operational effectiveness." Such metrics included initial and repeat sales orders, deferred revenue, gross margin, and operating expense management.

34.     The Registration Statement also noted that "[ShoreTel's] ability to forecast revenue is critical to managing our operating expenses."

35.     These statements were materially untrue and misleading because the Registration Statement failed to disclose that, at the time of the IPO, the Company was utterly unable to monitor its own financials down to the very basics, including whether vendors were paid and when revenue should be recognized. CW #1 and CW #2 both reported that former ShoreTel CFO John Finegan was not in control of or able to monitor the Company's financials. According to CW #1, when approached by a marketing executive about nonpayment of vendors, Finegan was defensive and showed financial records suggesting that checks to the vendors had gone out, but in fact, they had not.  In such cases, vendors did not receive payment until roughly a month after Finegan was questioned.

36.     In addition, the Company was unable to reasonably forecast its growth or measure its effectiveness of sales and marketing efforts as evidenced by the untrue and misleading statements and omissions regarding its financial results and growth discussed above and the Company's failure to reach its own guidance or analyst's expectations for sales for 2Q:08.

37.     Further, the Company's inability to track financial metrics also led the Company to under-allocate funds for its allowance for doubtful accounts and to fail to write off costs of sales associated with shipping demonstration and loaner phones for free – both caused the Company to materially understate expenses.

38.     Though the Company demoted Finegan to Vice President of Finance two months prior to the IPO, Defendants failed to disclose in its Registration Statement that the Company faced inherent financial problems as a result of Finegan's mismanagement.

39.     Indeed, on September 27, 2007 the Company admitted to having material weaknesses in its internal controls over financial reporting,   Defendant Combs also acknowledged, in a January 29, 2009 conference call, that "visibility is less" for the upcoming quarters because the Company's "process and method to forecast sales based on pipeline and growth in partners" had failed.

**Materially Untrue and Misleading Statements and Omissions Regarding the Basis for Calculating Allowances for Doubtful Accounts**

40.     Concerning the Company's allowance for doubtful accounts, Defendants stated that:

> We review our allowance for doubtful accounts on a quarterly basis by assessing individual accounts receivable that materially exceed due dates. **Risk assessment for these accounts includes historical collections experience** with the specific account and with our similarly situated accounts coupled with other related credit factors that may evidence a risk of default and loss to us. **Accordingly, the amount of this allowance will fluctuate based upon changes in revenue levels, collection of specific balances in accounts receivable and estimated changes in channel partner credit quality or likelihood of collection.**

(Emphasis added).

41.     The statements that the doubtful account allowance would fluctuate based on "credit quality or likelihood of collection" were materially untrue and misleading, because, in truth, prior to and at the time of the IPO, CW#1 and CW#4 confirmed that ShoreTel was issuing credit without regard to the customers' creditworthiness or ability to pay.  Still the Company was decreasing its allowance for bad debts, contrary to its stated policy.

42.     Statement of Financial Accounting Standards ("SFAS") No. 5, provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (*i.e.*, greater than a slight chance) that a loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or a range of loss, or state that such an estimate cannot be made.

43.     The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that, although disclosures in interim period financial statements may be abbreviated and need not

duplicate the disclosure contained in the most recent audited financial statements, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred." 17 C.F.R. § 210.10-01.

44.     In addition, Concepts Statement No. 5, states "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ."

45.     Despite SEC and GAAP reporting requirements and in contrast to Defendants' statements concerning allowance for doubtful accounts and their ability to monitor key financial metrics, the Company materially understated its allowance for bad debts in its Registration Statement.  Despite the fact that Accounts Receivable had *increased* over 60% from the period ending June 30, 2006 – meaning that more sales were made in that time period for which payment had not yet been received – the Company *decreased* its allowance for bad debt by over 30%.  Generally, as sales grow, the frequency of nonpayment will increase and so too should the allowances made for such doubtful accounts.  Defendants' decision to *decrease* its allocation for doubtful accounts was contrary to the statements in the Registration Statement that the allowance would "fluctuate based upon changes in revenue levels [and] accounts receivable," especially in light of the dramatic increase in accounts receivable and the risk factors present at the time of the IPO including aggressive sales tactics, customers' surprise when asked to pay within 30 days, and the Company's issuance of credit without regard to creditworthiness.

### Materially Untrue and Misleading Statements and Omissions Regarding Accounting for Demonstration Products and Loaners

46.     The Company also omitted from the Registration Statement material information regarding its use of demonstration products, stating, in relevant part:

> The marketing allowance can also be used by the channel partners **to purchase demonstration products from us at greater than the standard discount** for products sold to channel partners. **Such discounts provided to the channel partners are recorded as a reduction of revenue upon shipment of the demonstration units.**

47.     The above statement was materially untrue and misleading when made because, in truth, channel partners were not "purchas[ing] demonstration products . . . at greater than the standard discount;" rather, they were receiving them for free.  According to CW#4, ShoreTel's sales representatives had given "countless" products as temporary demos or loaners" but "never got them back and never charged them for keeping the stuff."  This practice occurred at least between 2002 and 2007.

48.     Despite the Company's stated policy that channel partners could "purchase demonstration products from [ShoreTel] at . . . discount" and that such discounts would be "recorded as a reduction of revenue," in truth, as CW#4 reported, "millions of dollars of equipment [was] unaccounted for" and had never been invoiced, written-off as a loss, or even disclosed.

**The Company's Untrue and Misleading Statements and Omissions Regarding its Growth and Allowances Violate GAAP and SEC rules**

49.     ShoreTel was required to furnish information required by Item 303 of SEC Regulation S-K in its Registration Statement.  Regarding the Company's results of operations, Item 303 required ShoreTel to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

50.     The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . .

51.     In addition, the SEC has indicated (in Interpretive Release No. 34-26831), that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the disclosure:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

52.     These requirements are intended to provide, in one section of a filing, material historical and prospective disclosure enabling investors to assess the financial condition and results of operations of the Company, with particular emphasis on the registrant's prospects for the future. As the Securities Act Release No. 6711 states:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . .

53.     "It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company." Securities Act Release No. 6349, supra n. 5, at 964.

54.     Nonetheless, ShoreTel's IPO Registration Statement failed to disclose that the Company's increases in revenue were not sustainable, because of, among other things, the Company offering customers "significant discounts" to accelerate revenues.  It also failed to disclose the Company's problematic reduction in its allowance for bad debt despite apparent trends in accounts receivable growth and Defendants' liberal granting of high-risk credit.

55.     In addition, because ShoreTel's demonstration units were often unaccounted for, the Company's inventory was overstated and its costs of sales were understated.  The basic tenets of GAAP state that an expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated.  The Registration Statement failed to disclose this millions of dollars of unaccounted for equipment

that had never been invoiced or written-off as a loss.  Accordingly, the financial position and operating results contained in ShoreTel's Registration Statement were materially untrue and misleading.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF THE COMPANY IS BELATEDLY DISCLOSED

56.     On September 27, 2007, less than three months after the IPO, the Company issued a 10-K for the year ending June 30, 2007 and announced "a material weakness in [the Company's] internal control over financial reporting as of June 30, 2007."  In particular, the Company disclosed that "[it] did not have sufficient internal controls related to the deferral of revenue" for certain transactions.  The 10-K went on to state:

> We are in the process of taking steps intended to remedy this material weakness, and **we will not be able to fully address this material weakness until these steps have been completed. We have commenced remediation activities, such as educating our sales and marketing personnel regarding revenue recognition policies and procedures, hiring a revenue recognition accounting manager, and a review process regarding customer communications.**

(Emphasis added).

57.     This announcement conceded that the Company's revenue recognition policies and procedures suffered from material weaknesses and thus the Company was not in compliance with GAAP or SEC rules.  At this time, investors began to learn that all of Defendants' representations in the Registration Statement regarding those metrics and policies that relied on revenue were materially untrue and misleading when made because they failed to disclose the Company was actually *unable* to monitor its revenue. In particular, ShoreTel's revenue recognition practices, compliance with its stated payment terms and policies, deferral of revenue for uncreditworthy channel partners, the ability to monitor financial metrics and forecast growth, and the ability to properly allocate an allowance for doubtful accounts were each determined, at least in part, by the Company's revenue.

58.     On this news, the value of ShoreTel stock dropped over 8% from a closing price of $15.68 on September 26, 2007 to close at $14.32 two days later, on volume more than eight times the average daily trading volume.

59.     As further evidence of ShoreTel's lack of internal controls at the time of the IPO, the Company revealed in its 10-Q filed November 6, 2008 that it would be forced to restate its Condensed Consolidated Statement of Cash Flows for the fiscal quarter ended September 30, 2007.

60.     While the September 2007 announcement began to reveal to investors that ShoreTel was not following its stated revenue recognition policies and was unable to monitor key sales metrics as represented in the Registration Statement, it did not yet disclose that these material weaknesses would have a dramatic effect on the Company's revenues.  Once these material weaknesses were remedied in the following quarters, ShoreTel could no longer rely on high-pressure sales tactics to record sales revenues sooner than would otherwise have occurred.

61.     As the Company remedied its internal control weaknesses, it was forced to recognize revenue in accordance with its stated payment terms and revenue recognition practices and to properly allow for doubtful accounts.  ShoreTel was also no longer able to extend credit without regard to creditworthiness. In addition, the Company would be forced to track products and services more closely such that it could no longer give away free demonstration products.

62.     Further compounding these negative effects on revenue, ShoreTel's channel partners would be unable to continue their sales momentum as ShoreTel began to follow its stated policies and became less willing to extend credit.  Thus, while revenues increased from $20.48 million in the quarter ended December 31, 2006, to $26.01 million in the quarter ended March 31, 2007, and $28.92 million in the quarter ended June 30, 2007, and revenues continued to increase to $31.98 million in the quarter ended September 30, 2007, revenues then declined to $30.56 million in the quarter ended December 31, 2007 and were only $31.49 million in the quarter ended March 31, 2008.

63.     Evidencing the loss in sales momentum that would be unavoidable once these material weaknesses were remedied, on January 7, 2008, the Company issued a press release announcing poor preliminary results for the fiscal second quarter which ended December 31, 2007.  The release announced that ShoreTel "fell short of [its] expectations" as Defendants

revealed that "sales to new customers declined" and reported results for the second quarter of fiscal quarter ended December 31, 2007 that were well below plan.  On that day, Defendants revealed that the Company would post revenues almost 20% lower than analysts' consensus estimates and millions below the Company's previously issued guidance for the quarter.  At that time, Defendants first revealed that sales to new customers were substantially lower than expected, and that sales to existing customers were not sufficient to offset these declines.

64.     These belated revelations evidenced Defendants' prior misrepresentations regarding ShoreTel's actual revenue growth trends.  As investors and the market ultimately learned, the Company's prior business prospects had been overstated in the Registration Statement as were the Company's results of operations.  This partial disclosure revealed losses stemming from the Company's undisclosed "do anything" internal pressure to sell which had caused the Company to exhaust its customer base such that revenue growth was unable to continue. ShoreTel's financial results fell well short of expectations in the quarters ended December 31, 2007 and March 31, 2008.

65.     As the truth was revealed regarding ShoreTel's inability to monitor its key financial metrics or comply with its stated revenue recognition policies, directly contrary to the representations in its Registration Statement, the resulting revenue drop occurred and the prior artificial inflation was eliminated through a series of disclosures of disappointing financial results from ShoreTel's share price.  ShoreTel's shareholders were damaged as a result of this related share price decline.

66.     As a result of the partially corrective disclosure on January 7, 2008, over six million shares of ShoreTel traded, more than 20 times the average daily trading volume, and the share price plummeted over 50%, from a close of $13.00 per share the prior trading day to a close of $6.02 per share on January 7, 2008.

67.     Analyst downgrades by Wedbush Morgan and Janney Montgomeray, based on the disappointing disclosure, confirmed the gravity of the materially untrue and misleading statements and the artificial inflation of ShoreTel's stock.  Upon the announcement of the

downgrades, ShoreTel's share price declined another 15.5% to close at $5.09 on January 8, 2008.

68.    Additionally, on January 29, 2008, Defendants conducted a conference call discussing the final financial results for the fiscal second quarter ending December 31, 2007.  In this call, Defendant Combs conceded that "the decline in sales was not a result of increased competition" and admitted that over 60% of its expected revenues were pushed out or delayed. The Company confirmed that it had failed to "offer any large-scale [end-user] promotions aimed at new customers" and that "[t]his may have hampered our ability to close new sales opportunities at the end of the quarter."  Defendant Healy acknowledged that "the decline from our record high new customer revenues . . . was the primary driver of the overall decline in sequential revenues."

69.    Although Defendants claimed these revenues were "delayed," when pressed by an analyst as to when these customers would come through, Defendant Combs acknowledged that the bookings in the current quarter "[were] on the same track as they were last quarter" and that the Company was "still in a little bit of an uncertain state."

70.    The Company also revealed in its results and conference call that inventories had increased by $1.7 million to reach $7.8 million as a result of the revenue shortfall.  Not only did the Company have a massive increase in inventory because of incomplete sales, but it expected the inventory balance to continue growing as additional products previously ordered were delivered.

71.    These disclosures confirmed to investors that the poor results anticipated in the January 7, 2008 release were caused when the Company failed to comply with its stated policies and practices and instead used aggressive sales tactics to improperly push sales to customers who would and/or could not pay. Once material internal control issues relating to revenue recognition were remedied after the IPO, ShoreTel was unable to record revenues for a substantial portion of its expected sales.  As alleged above, ShoreTel's purported financial metrics designed to "measure the effectiveness of sales and marketing efforts and measure operational effectiveness" were either grossly inadequate or nonexistent.

72.     As a result of these disclosures on January 30, 2008, the Company's stock again plummeted – this time falling nearly 17% in a single trading day – from a closing price of $6.06 on January 29, 2008 to close at $5.04 on January 30, 2008, on unusually high trading volume.

73.     The declines in ShoreTel's share price can be linked in substantial part to the efforts to remediate the internal control deficiencies directly related to the facts alleged in this Complaint as existing prior to the IPO and at the time of the Registration Statement.  In fact, in a Form 10-Q for the quarter ended December 31, 2007, filed on February 12, 2008, the Company stated on page 33, that:

> We are in the process of taking steps intended to remedy this material weakness, and we will not be able to fully address this material weakness until these steps have been completed. If we fail to maintain the number and expertise of our staff for our accounting and finance functions, and to improve and maintain internal control over financial reporting adequate to meet the demands of a public company, including the requirements of the Sarbanes- Oxley Act, we may be unable to report our financial results accurately. If we cannot do so, our business, reputation and stock price may decline.

74.     Later, in a Form 10-K for the fiscal year ended June 30, 2008 filed on September 12, 2008, the Company stated on page 75 that:

> **Changes in Internal Control over Financial Reporting**: We have previously reported on-going remediation efforts relating to the material weakness identified as of June 30, 2007 related to the deferral of revenue for the entire arrangement fees associated with transactions in which vendor specific evidence or fair value does not exist for undelivered product elements. During fiscal 2008, we designed and placed in operation new controls to remediate the material weakness. Specifically, we have educated our sales and marketing personnel regarding revenue recognition policies and procedures, hired a revenue recognition accounting manager, and implemented review process regarding customer communications. As of June 30, 2008, we have determined that the new controls are effectively designed and have demonstrated effective operation for a sufficient period of time to enable management to conclude the material weakness identified in 2007 has been remediated.

This remediation effort, discussed in the Form 10-K, would result in a significant reduction or elimination of the pre-IPO practice of prematurely recording or accelerating revenue recognition

and would reduce the revenues and earnings recognized and reported after the IPO relative to the levels and trends reported in the Registration Statement.

75.     During this time period, ShoreTel's competitors did not experience dramatic stock declines or the level of shortfall ShoreTel experienced.  As evidenced by the graph on the following page, ShoreTel's competitors did not experience a similar decline in share value with comparable timing or severity to ShoreTel's losses.   The nine companies including in the Comparable Companies Index are:   PolyCom Inc. (PLCM); ADTRAN Inc. (ADTN); Cisco Systems Inc. (CSCO); Global Crossing Ltd. (GLBC); Tech Data Corporation (TECD); Agilysys Inc. (AGYS); Symmetricom Inc. (SYMM); Ixia (XXIA); and Alcatel-Lucent (ALU).  Each of these companies was identified as selling, reselling, servicing, or providing related services involving IP telephony and competitive in some context with ShoreTel.  As can be seen in the graph, the share prices of these companies did not experience the same level of share price decline in the same time periods as ShoreTel and their share price movements were not closely connected to ShoreTel's share price movements such that the decline in ShoreTel's share price between January 6 and January 30, 2008 were largely unique to ShoreTel and specific to problems ShoreTel was experiencing for reasons set forth in this Complaint and not a result of general market or industry trends in the January to March 2008 time period.

//

//

//

//

//

//



**Shoretel Share Price Relative to Comparable Companies Index**
(PLCM, ADTN, CSCO, GLBC, TECD, AGYS, SYMM, XXIA and ALU)

## ADDITIONAL ALLEGATIONS REGARDING
### THE INDIVIDUAL DEFENDANTS

76.     Each of the Individual Defendants, by virtue of their high-level positions with the Company (as well as those high-level positions with the Company's subsidiaries and affiliates), directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.   Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the untrue and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

77.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock violated these specific requirements and obligations.

78.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the IPO.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, each of the Individual

Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

**ADDITIONAL ALLEGATIONS REGARDING
THE UNDERWRITER DEFENDANTS**

79.     Like the Individual Defendants, it is also appropriate to treat the Underwriter Defendants as a group for pleading purposes and to presume that the untrue, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.   Moreover, because of the Underwriter Defendants' positions, they each had access to the adverse undisclosed information about the Company's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

**NO SAFE HARBOR**

80.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any untrue statements of material fact or material omissions made in connection with an initial public offering.  15 U.S.C. § 77z-2(b)(2)(D).

81.     To the extent there were any forward-looking statements, the vast majority of the specific statements pleaded herein were not identified as "forward-looking statements" in the Prospectus and/or Registration Statement.  In addition, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

82.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those untrue forward-

looking statements because at the time each of those statements was made, the forward-looking statement was authorized and/or approved by an executive officer of the Company.

## CLASS ACTION ALLEGATIONS

83.     This is a class action on behalf of all persons who purchased ShoreTel shares, or traceable stock, pursuant to the July 2007 Registration Statement (the "Class"), excluding defendants. The Class period ends on January 29, 2008 when the true facts were fully revealed. Class members are so numerous that joinder of them all is impracticable.

84.     Common questions of law and fact predominate and include whether Defendants: (i) violated the Securities Act; (ii) whether the Registration Statement contained materially untrue and misleading statements and omissions concerning, among other things, the Company's ability to complete shipments to customers before payment became due; the Company's practice of booking sales as revenue regardless of customers' ability or intention to pay; net payment terms and associated revenue recognition policies; grant of customer credit; Company growth and demand for ShoreTel's products; the Company's allowance for bad debt/doubtful accounts; and its accounting for demonstration and loaner products; and (iii) the extent of and appropriate measure of damages.

85.     Plaintiffs' claims are typical of those of the Class.  Like the Class, Plaintiffs invested in ShoreTel common stock during the Class Period when it was overvalued because of the Registration Statement's failure to disclose that the Company would not be able to sustain growth and was unable to monitor key financial metrics.

86.     Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT I

## For Violations of §11 of the Securities Act Against ShoreTel

87.     Plaintiffs incorporate each and every allegation above as if stated herein.

88.    On or about July 3, 2007, issuer ShoreTel completed an IPO of 9.085 million shares of ShoreTel common stock priced at $9.50 per share, for total proceeds of at least $86 million.

89.    Each of the statements alleged herein relating to ShoreTel's prospects and financial results made in the Registration Statement were materially untrue and/or misleading when issued.  The true but concealed facts were that ShoreTel was not operating according to plan and that the Company would be unable to sustain its levels of growth because discounts provided to channel partners were causing accelerated sales.  Further, the Company would be unable to collect payment from a number of these customers even though their sales had already been booked as revenue.  These adverse conditions had already severely and adversely affected results of the Company prior to the IPO and would continue to hinder the Company in the foreseeable near-term.

90.    ShoreTel is strictly liable for the material misstatements and omissions in the registration statement and prospectus issued by it.

91.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

92.    By reason of the conduct herein alleged, ShoreTel violated §11 of the Securities Act.

## COUNT II

**For Violations of §11 of the Securities Act Against the Individual Defendants**

93.    Plaintiffs incorporate each and every allegation above as if stated herein.

94.    The Individual Defendants each signed ShoreTel's Registration Statement with the SEC and distributed the Registration Statement/Prospectus to investors.

95.    The Individual Defendants owed to the purchasers of the stock, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became

effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

96.     The officers and directors of ShoreTel were signatories to the Registration Statement.  By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiffs and the Class have been damaged.

97.     Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

98.     By reason of the conduct herein alleged, each of the Individual Defendants violated §11 of the Securities Act.

## COUNT III

**For Violations of §11 of the Securities Act Against the Underwriter Defendants**

99.     Plaintiffs incorporate each and every allegation above as if stated herein.

100.    The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

101.    The Underwriter Defendants owed to the purchasers of the stock, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

102.    The Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement.   By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiffs and the Class have been damaged.

103.    Less than three years elapsed from the time that the securities upon which this

Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

104. By reason of the conduct herein alleged, each of the Underwriter Defendants violated §11 of the Securities Act.

### COUNT IV

**For Violations of §15 of the Securities Act Against the Individual Defendants**

105. Plaintiffs repeat and re-allege each and every allegation contained above.

106. This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

107. Each of these Individual Defendants was a control person of ShoreTel by virtue of his or her position as a director and/or senior officer of ShoreTel or as a result of its large equity interest. The defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of ShoreTel.

108. Each of the Individual Defendants is liable for violating §15 of the 1933 Act based on their ability to control ShoreTel, which violated §11 of the 1933 Act as alleged in Count I above. This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding ShoreTel's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the Registration Statement and Prospectus.

109. The Individual Defendants, by reason of their stock ownership and/or positions with ShoreTel, were controlling persons of the Company and are liable under §15 of the Securities Act.

### **PRAYER**

**WHEREFORE**, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem just and proper.

1

## JURY TRIAL DEMANDED

2

    Plaintiffs hereby demand a trial by jury.

3

Dated: March 2, 2009          by:    /s/ Kim E. Miller

4

5

    Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**

6

12 E. 41st Street, 12th Floor
New York, NY 10017

7

Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

8

9

    Lewis S. Kahn
**KAHN GAUTHIER SWICK, LLC**

10

650 Poydras Street, Suite 2150
New Orleans, LA  70130

11

Telephone: (504) 455-1400

12

Facsimile:  (504) 455-1498
**Lead Counsel for Lead Plaintiffs & the**

13

**Class**

14

15

              -and-

16

    Reed Kathrein
Peter Borkon

17

**HAGENS BERMAN SOBOL SHAPIRO
LLP**

18

715 Hearst Ave., Suite 202

19

Berkeley, CA 94710
Telephone: (510) 725-3000

20

**Liaison Counsel for Lead Plaintiffs & the**

21

**Class**

22

              -and-

23

    Eric J. O'Bell

24

**LAW OFFICES OF ERIC J. O'BELL,
LLC**

25

3500 North Hullen Street

26

Metairie, Louisiana 70002
Telephone: (504) 456-8677

27

Facsimile: (504) 456-8624
**Additional Counsel for Lead Plaintiffs**

28

**and the Class**

1

**DECLARATION OF SERVICE**

2

    I hereby certify that this Second Amended Complaint was filed through the ECF system

3

on March 2, 2009 and will be sent electronically to the registered participants as identified on

4

the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered

5

participants.

6

7

8                                                            /s/ Kim E. Miller

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28