IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SHORETEL INC., SECURITIES LITIGATION, _____/ | No. C 08-00271 CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT** |

In this securities law putative class action, Plaintiffs are Shoretel, Inc. shareholders who purchased common stock pursuant to a July 3, 2007 Initial Public Offering ("IPO"). On February 2, 2009, the Court granted Defendants' motion to dismiss the consolidated amended complaint ("CAC"). Defendants ShoreTel now move to dismiss Plaintiffs' second amended consolidated complaint ("SAC"), arguing that the SAC does not cure the deficiencies the Court identified in its February 2, 2009 Order. After carefully considering the papers filed by the parties and the parties' excellent oral argument, the motion to dismiss is hereby GRANTED in part and DENIED in part.

## BACKGROUND

Plaintiffs filed the CAC on June 27, 2008. The CAC alleged that in connection with its IPO, ShoreTel issued a Registration Statement that made materially untrue statements and omissions regarding the company's growth, actual payment terms and associated revenue recognition practices, credit and associated revenue recognition, monitoring of key financial metrics, accounts receivable allowance, and demonstration products. CAC at ¶ 20-51. The CAC asserted that Plaintiffs first learned of the Registration Statement's

misstatements/omissions on January 7, 2008, in a press release in which ShoreTel reported its results for the second quarter ending December 31, 2007. CAC ¶ 52. It alleged: "At that time, Defendants first revealed that sales to new customers were substantially lower than expected, and that sales to existing customers were not sufficient to offset these declines." CAC ¶ 52. The CAC concluded: "These belated revelations evidenced Defendants' prior misrepresentation of ShoreTel's business prospects." CAC ¶ 53.

The Court granted Defendants' first motion to dismiss on February 2, 2009, holding that "the allegations of the Complaint– and the [January 7, 2008] press release itself– establish that the press release did not disclose the alleged misstatements or misleading omissions and therefore establishes defendants' negative causation defense." Order at 9. The Court further held that Plaintiffs had sufficiently stated a claim as to some of the alleged misstatements/omissions in the Registration Statement, but had failed to identify misstatements/omissions relating to the monitoring of key financial metrics, the accounts receivable allowance, and demonstration products. Id. at 3-6. The Court dismissed those three claims with leave to amend. Id. at 10.

Plaintiffs filed the SAC on March 2, 2009. The SAC sought to defeat Defendants' negative causation defense by alleging that Plaintiffs' loss was caused not only by the January 7, 2008 press release, but by "a series of partial disclosures" that also included a 10-K filed on September 27, 2007 and a conference call on January 29, 2008. SAC at ¶ 11. The SAC included much more detailed allegations as to the January 7, 2008 press release and its effect on the market. Id. ¶¶ 63-65. The SAC also attempted to better identify the misstatements/omissions in the Registration Statement about the monitoring of key financial metrics, the accounts receivable allowance, and demonstration products. Id. ¶ 33-48.

Defendants have moved to dismiss the SAC.

## DISCUSSION

Plaintiffs' claims arise under Sections 11 and 15 of the Securities Act of 1933. Section 11 creates a private right of action for purchasers of securities if the issuer publishes a registration statement in connection with a security that "contained an untrue statement of a

material fact or omitted . . . a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 15 creates a cause of action against individuals who control individuals liable under Section 11. 15 U.S.C. § 77o.

### 1.     Negative Causation Defense

Plaintiffs bringing Section 11 cases need not allege loss causation, but defendants may disprove loss causation as an affirmative defense by showing that the plaintiffs' loss, or some portion of it, was not caused by the alleged misstatements. See 15 U.S.C. § 77k(e) ("if the defendant proves that any portion or all of such damages represents other than the depreciation in value . . . resulting from such part of the registration statement, with respect to which his liability is asserted, . . . such portion or all such damages shall not be recoverable").[1] This affirmative defense is referred to as "negative causation." See, e.g., In re New Century, 588 F. Supp. 2d 1206, 1237 (C.D. Cal. 2008).

Numerous cases have attempted to articulate what a disclosure must say in order to establish loss causation.[2] See, e.g. In re New Century, 588 F. Supp. 2d at 1236 (internal citations omitted) ("[T]he Supreme Court in Dura did not . . . indicate what form a disclosure must take, how completely it should reveal previously misrepresented or concealed information, or how specifically it must refer to that information. . . . Rather, Plaintiffs must plead facts giving rise to a reasonable inference that the market became aware of the misrepresentations."); In re Oracle Corp. Sec. Litig., 2009 WL 1709050 *12 (N.D. Cal. 2009) ("At one end of the spectrum, it is clear that the plaintiff need not prove that the defendant admitted a fraud . . . . At the other extreme, it is equally clear that the plaintiff must do more than show that the market was 'merely reacting to reports of the defendant's poor financial health generally.'").

---

[1] Plaintiffs object to Defendants' citation of Section 10(b) cases, where Plaintiffs must plead loss causation. Opp. at iv. However, as the Court explained in its February 2, 2009 Order, "While plaintiffs did not have to allege loss causation here, plaintiffs nonetheless affirmatively alleged that the January 7, 2008 press release caused the losses of the putative class." Order at 9.

[2] Again, many of those cases relate to Section 10(b), in which plaintiffs must plead loss causation; while Plaintiffs need not plead loss causation here, the section 10(b) cases are nonetheless instructive.

3

Disclosure of an earnings loss alone is insufficient to establish loss causation. See In re Oracle at *16 ("The Ninth Circuit's decisions in Gilead and Daou confirm that loss causation requires more than a company's announcement of a missed financial projection"). Thus in In re Daou Systems, Inc., 411 F.3d 1006, 1026 (9th Cir. 2005), the court found that plaintiffs had adequately linked losses in a quarterly report to the company's premature recognition of revenue by alleging: "Defendants further revealed that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables– the direct result of prematurely recognizing revenue." The court held: "the foregoing allegations, if assumed true, are sufficient to provide [Defendant] with some indication that the drop in [Defendant's] stock price was casually related to [Defendant's] financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned." 411 F.3d at 1026.

The Ninth Circuit commented on Daou in Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1063 (9th Cir. 2008), concluding that the Daou plaintiffs had adequately alleged loss causation "because their complaint alleged that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." In contrast, the court in Metzler affirmed dismissal of the complaint for failure to allege loss causation where, at best, plaintiff had alleged that a press release's reference to student attrition was a euphemism for defendant's widespread fraud as to the school's number of enrolled students; the court held that a plaintiff cannot plead loss causation through euphemism. Id. at 1064-65. The court explained: "So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud. . . . Loss causation requires more." Id. at 1064.

Here, Plaintiffs alleged in the SAC that the January 7, 2008 press release contributed to Plaintiffs' loss.[3] The press release states:

---

[3] This Order will not address Plaintiffs' loss causation allegations pertaining to the September 27, 2007 10-K and the January 29, 2008 conference call, as it need not reach them.

4

> ShoreTel . . . announced preliminary results for the quarter ended December 31, 2007 . . . lower than its previous expectation . . . fell short of our expectations . . . sales to existing customers grew during the quarter, however, sales to new customers declined. We are still in the process of analyzing the factors affecting our results for the quarter and will discuss the results further when we hold our regularly scheduled earnings conference call at the end of January.

The SAC's allegations about the press release are lengthy. They include that the press release "evidenc[ed] the loss in sales momentum that would be unavoidable once . . . material weaknesses were remedied," SAC ¶ 63, that "[t]his partial disclosure revealed losses stemming from the Company's undisclosed 'do anything' internal pressure to sell which had caused the Company to exhaust its customer base such that revenue growth was unable to continue," Id. ¶ 64, and the press release revealed the truth "regarding ShoreTel's inability to monitor its key financial metrics or comply with its stated revenue recognition policies, directly contrary to the representations in its Registration Statement," Id. ¶ 65. Plaintiffs made additional allegations about the press release in their opposition to the motion to dismiss, including that it **"**revealed adverse information about ShoreTel's financial health (poor financial results) that the misrepresentations (compliance with certain policies, procedures, metrics, and revenue recognition practices) had concealed (allowing the Company to irresponsibly grant credit, minimize allowances for doubtful accounts, and give away products which created revenue inflation)." Opp. at 8.

Of course, the press release says nothing about remedying internal controls, about having failed to comply with ShoreTel's stated policies, or about having previously exhausted its customer base. As the Court held in the September 2, 2009 Order, it "merely disclosed that Shortel's results . . . fell short of expectations and that a preliminary review revealed that sales to new customers had declined, although sales to existing customers had increased." Order at 8. Nonetheless, the burden of proof on a negative causation defense is on Defendants, and that burden is heavy. See In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1421-22 (9th Cir. 1994). To dismiss a complaint based on negative causation, the complaint has to foreclose the possibility that defendants caused plaintiffs' losses. In re Wash. Mutual, Inc., 2009 WL 1393679 at *18 (W.D. Wash. 2009). See also In re Worlds of Wonder, 35 F.3d at 1421-22 ("Deloitte needed to prove 'that the depreciation in value [of the

5

debentures] resulted from factors other than the [alleged] material misstatement in the [1987 financial] statement.").

While Plaintiffs' allegations as to the January 7, 2008 press release might not be indisputable, Plaintiffs have now made allegations that, if true, would establish loss causation. See In re Gilead Sciences Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate"). As in Daou, where plaintiffs adequately alleged loss causation "because their complaint alleged that the market learned of and reacted to this fraud," Plaintiff's complaint now alleges that the revenue drop occurred as a result of the truth being "revealed regarding ShoreTel's inability to monitor its key financial metrics or comply with its stated revenue recognition policies, directly contrary to the representations in its Registration Statement." See SAC ¶ 65. Unlike the plaintiffs in In re McKesson, Inc. Securities Litigation, 126 F.Supp.2d 1248, 1262 (N.D. Cal. 2000), where "there [was] no allegation in the complaint that any corrective disclosures reached the market," Plaintiff has alleged that the disclosure resulted in the truth reaching the market.

It is not impossible that the market understood the press release to have revealed previously undisclosed facts about misstatements in the Registration Statement. See In re New Century, 588 F. Supp.2d at 1238 ("Admittedly, the connection between the . . . disclosure and [Defendants'] allegedly misleading statements may be found too attenuated, or the existence of intervening causes may be too significant, for Plaintiffs to establish loss causation. Those are factual questions that this Court does not resolve on a 12(b)(6) motion."). The Court cannot conclude that the SAC absolutely "foreclose[d] the possibility that defendants caused plaintiffs' losses," see In re Wash. Mutual at *18, or that Defendants have "prove[n]" that the stock drop "resulted from factors other than" the alleged misstatement, see In re Worlds of Wonder, 35 F.3d at 1421-22. Therefore, Defendants have failed to meet their burden of establishing a negative causation defense.

//
//

6

### 2. Untrue Statements and Misleading Omissions

Under Federal Rule of Procedure 8(a)(2), a pleading is to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court recently reiterated that while Rule 8 does not require detailed factual allegations, a complaint must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007). Courts are to reject "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," "labels and conclusions," and "'naked assertion[s]' devoid of 'further factual enhancement.'" Id.

Defendants assert that Plaintiffs' claims as to the monitoring of key financial metrics, the accounts receivable allowance, and demonstration products remain deficient under this standard and should be dismissed. Mot. at 12.

A. *Statements Regarding Monitoring of Key Financial Metrics*

The Registration Statement reported that ShoreTel "monitor[s] a number of key metrics to help forecast growth, establish budgets, measure the effectiveness of sales and marketing efforts and measure operational effectiveness." SAC ¶ 33.

The SAC alleges that this statement was "materially untrue and misleading because the Registration Statement failed to disclose that, at the time of the IPO, the Company was utterly unable to monitor its own financials down to the very basics." Id. ¶ 35. The SAC then recites the exact same supporting allegations as did the CAC: that the former ShoreTel CFO "was not in control of or able to monitor the company's financials," that the company was "unable to reasonably forecast its growth or measure its effectiveness of sales and marketing efforts," and that the company had an "inability to track financial metrics." Compare id. ¶¶ 35-38; CAC ¶¶ 34-37.

The Court's February 2, 2009 Order held that "Plaintiffs have not identified how the Registration Statement representation is false or misleading" because "Plaintiffs do not allege that Shoretel did not engage in monitoring, only that it did so poorly." Order at 5-6. The SAC now goes further by alleging that ShoreTel was "utterly unable to monitor its own

7

financials," but it cites in support the exact same allegations this Court already held insufficient. Because this claim remains essentially unchanged from the CAC, Plaintiffs have again failed to state a claim as to the Registration Statement's statements regarding the monitoring of key financial metrics. This claim is therefore dismissed with prejudice.

B.  *Statements Regarding Accounts Receivable Allowance*

The Registration Statement reported that ShoreTel had an allowance of $256,000 for the period ending March 31, 2007, and stated:

> We review our allowance for doubtful accounts on a quarterly basis by assessing individual accounts receivable that materially exceed due dates. Risk assessment for these accounts includes historical collections experience with the specific account and with our similarly situated accounts coupled with other related credit factors that may evidence a risk of default and loss to us. Accordingly, the amount of this allowance will fluctuate based upon changes in revenue levels, collection of specific balances in accounts receivable and estimated changes in channel partner credit quality or likelihood of collection.

CAC ¶ 38. The SAC cites to this language but removes the CAC's reference to the amount of ShoreTel's allowance ($256,000). SAC ¶ 40.

The SAC asserts that the statements that the allowance "would fluctuate based on 'channel partner credit quality or likelihood of collection' were materially untrue and misleading because . . . prior to and at the time of the IPO . . . ShoreTel was issuing credit without regard to the customers' creditworthiness or ability to pay." Id. ¶ 41.[4] It continues: "the Company was decreasing its allowance for bad debts, contrary to its stated policy." Id. The SAC includes many of the same supporting allegations as did the CAC. Compare id. ¶¶ 42-45; CAC ¶¶ 39-42.

Both the CAC and SAC conclude that "the Company materially understated its allowance for bad debts in its Registration Statement," and complain that though accounts receivable had increased by 60%, the company decreased its allowance for bad debt by over 30%. CAC ¶ 42, SAC ¶ 45. However, while the CAC concluded that Shoretel's "decision to decrease its allocation for doubtful accounts was <u>negligent</u> in light of the dramatic increase in

---

[4] The February 2, 2009 Order found that the CAC had stated a claim as to the Registration Statement's statement that if a partner is not creditworthy, Shortel does not recognize any revenue from a sale until payment is received and all other revenue recognition criteria have been met." Order at 5.

8

accounts receivable," CAC ¶42 (emphasis added), the SAC concludes that ShoreTel's "decision to decrease its allocation for doubtful accounts was <u>contrary to the statements in the Registration Statement</u> that the allowance would 'fluctuate based upon changes in revenue levels [and] accounts receivable,' especially in light of the dramatic increase in accounts receivable," SAC ¶45 (emphasis added).

The Court's February 2, 2009 Order held that "regardless of whether Shoretel should have increased its bad debt allowance, and was negligent in not doing so, plaintiffs fail to articulate how the statement in the Registration Statement – which accurately reflected the amount of the allowance– was false." Order at 6. Plaintiffs argue that they do not dispute the amount of the accounts receivable allowance, but contend that "the Company issued credit without regard to creditworthiness and therefore did not adjust accounts receivable based on 'changes in channel partner credit quality' as represented." Opp at 13, n.9. They further clarify: "Although the amount of the allowance may indeed have been as Defendants represented, the Complaint [argues] that that dollar amount was <u>not</u> determined by any of the represented risk assessment methods." <u>Id.</u> at 14.

Though Plaintiffs have made only a minor adjustment to their pleading, they have changed this claim from one about the amount of the allowance (though the SAC continues to allege that "the Company materially understated its allowance"), to one about the process used to come up with the allowance ("the Company was decreasing its allowance for bad debts, contrary to its stated policy"). The cases cited by Defendant, involving allegations that a Defendant did not allow adequate reserve, are thus distinguishable; Plaintiff's claim is not about the amount of the reserve but the process used to maintain it. Plaintiffs' amendments are thus sufficient to state a claim.

C. *Statements Regarding Demonstration Products*

The Registration Statement stated: "The marketing allowance can also be used by the channel partners to purchase demonstration products from us at greater than the standard discount for products sold to channel partners. Such discounts provided to the channel

9

partners are recorded as a reduction of revenue upon shipment of the demonstration units." SAC ¶ 46.

The SAC alleges that that statement was "materially untrue and misleading when made" because "channel partners were not 'purchas[ing] demonstration products . . . at a greater than the standard discount;' rather, they were receiving them for free." Id. ¶ 47. It further asserts that "'millions of dollars of equipment [was] unaccounted for' and had never been invoiced, written-off as a loss, or even disclosed." Id. at 48. Though worded differently, these are the same allegations Plaintiffs made in the CAC. See CAC ¶ 44 ("ShoreTel failed to request that these systems be returned and never charged customers for keeping products"); ¶ 45 ("The Registration Statement failed to disclose this millions of dollars of unaccounted for equipment that had never been invoiced or written-off as a loss").

The Court's February 2, 2009 Order held that the CAC failed to state a claim as to the demonstration products, because it failed to address how the Registration Statement was false or misleading. Order at 6. The claim in the SAC does not differ materially from the claim in the CAC. Therefore, the Court finds that Plaintiffs have still not stated a claim as to the statements regarding demonstration products, and dismisses this claim with prejudice.

**3.   Section 15**

Those of Plaintiffs' Section 15 claims that are based on Plaintiffs' surviving Section 11 claims shall also survive. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000) (plaintiff must establish primary violation of securities laws in order to establish controller liability).

**CONCLUSION**

For the foregoing reasons, the Court rules as follows:

(1) Defendants' motion to dismiss on the ground that the SAC establishes negative causation is DENIED.

(2) Defendants' motion to dismiss the Section 11 claims as to the statements regarding the monitoring of key financial metrics and the statements regarding demonstration products are GRANTED; those claims are dismissed with prejudice.

(3) Defendant's motion to dismiss the Section 11 claim as to the statements regarding the accounts receivable allowance is DENIED.

(4) Defendant's motion to dismiss the Section 15 claims is DENIED.

**IT IS SO ORDERED.**



Dated: August 18, 2009

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2008\271\orderreMTD-SAC.wpd         11